ASSOCIATES DEVELOPMENT CORPORATION et al., Appellants,

v.

AIR CONTROL PRODUCTS, INC., Appellee.

No. 11319.

Court of Civil Appeals of Texas.

Austin.

June 30, 1965.

Rehearing Denied July 21, 1965.

Mitchell & Gilbert, Arthur Mitchell, Phillip W. Gilbert, Austin, for appellants.

T. O. Dillard, Austin, for appellee.

HUGHES, Justice.

This is a suit on a sworn account in the amount of $1,252.66, for goods and merchandise sold by appellee, Air Control Products, Inc., to Hallmark Builders, Inc. Sued also were Joseph F. Chesley and Associates Development Corporation whose liability for the account in suit was sought to be based on allegations that the two Corporate defendants were the mere alter ego of the defendant Joseph F. Chesley.

Trial was non-jury, the court rendering judgment for appellee for the amount of the account plus $500.00 attorney's fees against all defendants and the judgment directed that Gracy Title Company pay the judgment from funds held by it as proceeds of a sale of certain real property in Hays County.

Hallmark did not appeal from this judgment; Chesley and Associates did appeal.

The judgment of the trial court is, from the record, patently erroneous in two respects. It is for an excessive amount for the reason that appellee testified that 25% of its account had been paid. The other obvious error is that it directs Gracy Title Company to pay the judgment. Gracy Title Company is not a party to this suit. It is not bound by the judgment herein and the judgment should not run against it even in a directive manner.

We have read the voluminous statement of facts and have examined the many exhibits in the record. We have concluded that this case should be reversed and remanded because the judgment and the implied findings to support it are so against the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

There are findings of fact and conclusions of law in the record but we have disregarded them for the reasons now to be stated.

Final judgment was rendered in this case on November 24, 1964. There was no motion for a new trial.

Appellants requested findings of fact and conclusions of law December 3, 1964, within the time prescribed by Rule 296, Texas Rules of Civil Procedure.

The requested findings and conclusions not having been filed, appellants on January 15, 1965, called this omission, in

writing, to the attention of the trial court. This notice was not timely given. Rule 297, T.R.C.P. This failure deprived appellants of the right to complain that findings and conclusions were not filed. Id. The trial court, however, filed his findings and conclusions on January 21, 1965.

This belated filing left appellants and the trial court insufficient time allowed by Rule 298 for requesting and filing additional or amended findings and conclusions. Under these circumstances, we consider this appeal as if no findings or conclusions had been requested, made or filed.

There is no question but that Hallmark bought the goods and merchandise shown in the account from appellee. Hallmark did not appeal and the judgment against it is not disturbed by our judgment in this case.

Mr. Chesley organized Hallmark and Associates as well as several other corporations, some of which, including Associates, are still functioning. Chesley owned all the stock in Hallmark and about 80% of the stock in Associates and was President of both. Appellee has attempted to show that Chesley and the two named Corporations are in law and in fact only one identity—i. e. Chesley.

First, let it be stated, there is no limit on the number of corporations which one person may own or control. In State v. Swift & Co., 187 S.W.2d 127, 131, Tex. Civ.App., Austin, writ ref., the Court stated, "The same persons may form as many separate corporations to carry on as many separate businesses as they may wish."

Swift also lays down rules for determining when the corporate structure will be disregarded.[1] There only corporations were involved, but the same rules are applicable as between corporations and individuals. We quote such rules as there given.

" * * * the general rule is that the separate corporate entity of corporations will be observed by the courts, even though one may dominate or control another, or may treat it as a mere department, instrumentality, agency, etc.; and courts will disregard the separate legal identities of the corporations only when one is used to defeat public convenience, justify wrongs, protect fraud or crime of the other (Citing cases). These cases discuss at length proper methods or standards of handling relations between a parent and a subsidiary corporation so as to prevent their separate corporate identities from being disregarded by the courts. After reviewing particularly the Berkey case, Mr. Justice Douglas, before going on the bench, wrote an article for 39 Yale L.J. 193, in which such methods or standards are summarized as follows:

'The observance of the following four standards will keep the business units from being treated as assimilated: (1) A separate financial unit should be set up and maintained. That unit should be sufficiently financed so as to carry the normal strains upon it. The risks attendant on the conduct of a business of that type can roughly be averaged and that average met. (2) The day to day business of the two units should be kept separate. Normally each process can be tagged so as to identify it with the activity of one unit or with that of the other. Occasionally such tagging will be difficult in a case where the two businesses are merely units in a line of production. But such separation as the technology of the business permits should be sufficient. And in addition the financial and business records of the two units should be separately kept. (3) The formal barriers between the two management structures should be main-

---

1. See an excellent opinion on this subject in Radio KBUY, Inc. v. Lieurance, 390 S.W.2d 16, Tex.Civ.App., Amarillo, n.w.h.

tained. The ritual of separate meetings should be religiously observed. The activities of the individuals serving on the two boards can be tagged so that the individuals qua directors of the subsidiary can always be distinguished from the same individuals qua directors of the parent. Such tagging is not pure fiction. It draws the line that keeps the dual capacities separate and distinct. It conforms to the habit of thought which accepts the fact of dual capacity but which demands a separation of conduct so that each act may be clearly categorized. Separate meetings of the boards are sufficient. The same problem arises in connection with the officers. And the same solution suggests itself. A man may not be indiscriminately one officer or another. The observance of the niceties of business efficiency are normally sufficient. Such demands are not exacting. They merely suffice to keep the record of the business affairs of the two units from becoming hopelessly intermingled. (4) The two units should not be represented as being one unit. Those with whom they come in contact should be kept sufficiently informed of their separate identities.' "

■ The undisputed evidence is that appellee never dealt with Mr. Chesley regarding any of the sales made to Hallmark. Appellee transacted business only with Mr. Ennis who managed Hallmark on a commission basis. Appellee's manager testified he dealt with Hallmark as a corporation. All goods sold by appellee to Hallmark were billed to Hallmark, and the personal liability of Mr. Chesley or the corporate liability of Associates was not suggested by appellee until long after the bills were incurred.

The manner in which Mr. Chesley and Hallmark and Associates conducted their businesses is reflected by the following summary of the testimony of Mr. Chesley which is not contradicted.

The bank accounts of Associates, Hallmark and Chesley were kept separate. None of the personal bills of Chesley was paid by either corporation. Separate income tax returns were filed for each of the identities, and no corporate losses were deducted by Mr. Chesley from his returns.

Associates held annual meetings of its directors and stockholders. It is not shown that Hallmark did the same, but its minutes show a special meeting of its stockholders (one), and directors on October 21, 1963, to ratify a contract between Hallmark, Associates, Chesley and Cleve Ennis. This contract will be noticed in some detail later.

Associates was incorporated with an authorized capital stock of $10,000.00. Hallmark was incorporated with an authorized capital stock of $1000.00.

Mr. Byron Shupee, a bookeeper by profession, kept the books for both Hallmark and Associates prior to the sale of Hallmark to Ennis by the Contract of October 21, 1963. Thereafter, he kept only the books of Associates. Mr. Shupee produced all of the books of these corporations in his possession, however, some of the books of Hallmark were not available since they were delivered to the office of Hallmark after its sale to Ennis, and their absence is not attributed to Mr. Chesley.

These facts clearly show compliance with the rules prescribed in Swift for determining whether a corporation is a mere sham or dummy for another person or corporation. The only fact which may give rise to doubt is the nominal amount of stock authorized for Hallmark. Using hindsight, the amount of capital was inadequate.

The mode of operations between Hallmark and Associates, during the time Chesley controlled both corporations, was for Associates to buy acreage, subdivide it, and then sell to builders, such as Hallmark, who would build houses on the lots and sell them. The anticipated profit of Hallmark was in the construction and sale of the houses. The profit of Associates was in the sale of

the subdivider acreage. As shown by this record, the construction of houses by Hallmark was through bank financing. It was not dependent upon corporate capital. When we consider that the capitalization of a corporation is a matter of public record, we cannot attribute great significance to this evidence as to Hallmark's capital in determining whether it was but a sham or the alter ego of Chesley or Associates. It has weight, but in our opinion, it does not tilt the scales far enough to overcome the lack of evidence in other respects.

Finally, it is contended that the transactions between Chesley, Associates and Hallmark are such as to constitute fraudulent manipulations and, hence, to impose joint liability on all for the debt due appellee. This contention stems from a Contract between Chesley, Hallmark and Associates by which Chesley conveyed all of the stock of Hallmark to Cleve Ennis.

Mr. Ennis had been employed by Hallmark and had done most of its subcontracting and building. He was thoroughly familiar with the business of Hallmark. He was an experienced builder. He consulted counsel before entering upon the Contract. There is no evidence that this Contract was not one made at arm's length. Mr. Ennis could not obtain the financing which he expected and which was necessary in order to carry out the Contract. Upon the failure of Mr. Ennis to perform his obligations under the Contract it became incumbent upon Chesley to step in and salvage the projects underway and on which he was personally liable. These actions by Mr. Chesley did not result in any profit to him. They all resulted in losses.

We will not undertake to discuss all of the provisions of the Contract between the named parties nor all of the involved transactions between them. We will briefly discuss some of the more important aspects of these matters.

In the October 1963 Contract between the four named parties, Chesley reserved the right to remain as Vice President of Hallmark until December 1, 1963, in order to complete and sell four houses under construction in Williamson County by Hallmark which were financed by loans on which Chesley was personally liable. Chesley and Ennis were to each receive 2½% of "each job."

Under the Contract Hallmark was to complete and convey to Associates three houses under construction in Hays County by using money arranged to be borrowed on those houses on which loans Chesley was personally liable. Hallmark failed to perform this obligation and Chesley had to step in to protect himself. These houses were completed at a loss to Chesley.

The principal consideration under the Contract moving to Hallmark was the agreement by Associates to convey it approximately 50 building lots in Williamson County for $6,000.00 cash and the assumption of certain debts.

Under the Contract, Hallmark also agreed to assume and hold the other parties harmless from certain debts among which was an account due appellee herein.

After the failure of Hallmark and Ennis to perform under the Contract, The Citizens State Bank at Georgetown foreclosed its liens on the houses under construction by Hallmark in Williamson County and bought them, paying in excess of its debts.

Appellee points to the fact that Chesley before making the October 1963 Contract had drawn down most of the interim financing furnished by the Georgetown bank for construction of the four Williamson County houses and that such withdrawals were for the purpose of paying it and other laborers and materialmen on those jobs. These "draws" were based on a percentage of completion of the houses, including a percentage of windows furnished by appellee, and were not for the purpose of paying any specific items. The evidence is undisputed that all of such funds so withdrawn were placed to the account of Hallmark and all was used for the purpose of paying Hallmark's debts.

It is certainly regrettable that appellee has sold its merchandise to a Corporation unable to pay for it. Appellee has no one to blame for this but itself. It was not misled, deceived or defrauded by any one so far as this record shows. It would be more regrettable if persons not legally liable for this account should be required to pay it.

In National Hotel Co. v. Motley, 123 S. W.2d 461, Tex.Civ.App., Eastland, writ dism. c. j., it is stated that, "We do not believe there is any exception to the general rule of the non liability of a stockholder for the debts of a corporation based alone upon the fact of the insolvency of the corporation."

There is very little evidence in this record other than insolvency of Hallmark to justify imposition of liability for its debts upon Chesley and Associates.

The judgment of the trial court is reversed and this cause is remanded.

Reversed and remanded.