One appeal (85-815) challenges a ruling in which the trial court refused to find that a medical doctor and his wife were the alter ego of a medical clinic corporation and also refused to impose a constructive trust on funds transferred to the medical clinic by the plaintiff/appellant hospital pursuant to an agreement between the doctor and the hospital. The second appeal (85-875) challenges the trial court's action in granting the hospital's motion for judgment notwithstanding the verdict, or in the alternative for a new trial, on the hospital's claim for damages based upon an alleged breach of contract by the medical clinic. We affirm as to both appeals.
 FACTS
Many of the facts are not disputed. We set forth the facts substantially as they are included in the hospital's brief.
East End Memorial Association, d/b/a Medical Center East ("East End"), the plaintiff-appellant herein, is a not-for-profit, membership association corporation, composed of more than 300 individuals, companies, and churches making up 3,000 to 3,500 membership votes. East End was set up in approximately 1946 by individual citizens and civic clubs who saw a need for a hospital on the eastern side of Birmingham. These individuals, civic clubs, and churches raised money to purchase the female dormitory at the old Howard College campus, and they converted it into a 66-bed hospital.
In 1978, one of the geographic areas served by East End was the city of Trussville, located in the eastern part of Jefferson County. Prior to 1978, a Dr. Thompson *Page 39 
was running a family practice in Trussville, and sometime in 1977 defendant-appellee Dr. Karl Egerman opened a pediatric practice in Trussville. Dr. Thompson and Dr. Egerman were the only physicians in the Trussville area at that time.
Dr. Thompson, as a member of the medical staff of East End, customarily sent his patients needing hospital services to East End. It was estimated that 55 to 65 percent of the people in Trussville who needed hospitalization used East End. Sometime in 1978, Dr. Thompson retired and sold his office and medical practice to Carraway Methodist Medical Center. East End, realizing that it no longer had a family practitioner in the Trussville area, assessed the community needs to determine if another family practitioner was needed by the community and could be supported by the Trussville community.
Based upon the information that the Birmingham Regional Health Systems Agency had gathered from the American Medical Association, the American Hospital Association, and other medical planning entities throughout the country, East End determined that the population of the Trussville area would support a minimum of at least two additional primary care physicians. With the statistical data in hand showing that the Trussville area population could support another family practice, East End made the decision to set up a family practice clinic in the Trussville area. Evidence presented shows that the forecast made by East End was valid. There are currently three family practice physicians serving the area in addition to Dr. Egerman. At the time of the proposal, there was only one.
East End's general approach, after determining that there was a need for a clinic in a given locality, was to first offer the opportunity to a staff physician. That staff physician could employ an additional physician or take on a partner. If no staff member accepted the offer, then East End would recruit an outside physician and assist that physician in establishing his own office. Dr. Karl Egerman, a member of the staff of East End, was offered the opportunity to employ a family practitioner in Trussville with assistance from East End or to become an employee of an East End-owned clinic if that was his preference, and East End would recruit the additional physician for him. Dr. Egerman accepted the offer to employ an additional physician in his own practice.
East End had a "gross guarantee program" that it had used before, successfully, to assist new doctors in operating their own clinics. Under this "gross guarantee program", East End, for the doctor's first year of practice, would guarantee that the physician would gross a specified amount of income to be generated through the doctor's private practice, teaching, and other resources, such as working in East End's emergency room. The physician could also borrow interest-free money from East End as "start up" money, as needed, to help establish his medical practice. The gross income guarantee amount is based on anticipated gross income to be generated from all sources during the first year of practice. Stated simply, the gross guarantee program is designed to help the physician get started, and to guarantee him a fixed amount of gross income for his first year, even if he grossesless than what was anticipated.[1]
Under the gross guarantee plan, East End does not get involved in the physician's internal operation. The doctor would select his own quarters and would make his own decisions about equipment purchases and about whom he would hire and what he would pay them. He would set his own salary or draw, if any. East End could review the physician's books at the end of the year and, if there was a dispute, could determine whether the guarantee amount had been met. East End had no right to *Page 40 
look at the physician's books until after the end of the guarantee period. Loans were advanced when, and in amounts, requested by the physician. East End had entered into this gross guarantee arrangement with six physicians previously, and the arrangements proved acceptable to East End. This one obviously did not.
At about the same time that the gross guarantee program was being offered to Dr. Egerman, two Canadian physicians, who had practiced only one year, contacted East End by letter, expressing an interest in looking at opportunities in Birmingham. These doctors, Norman Abramson and Bryan McClelland, visited Birmingham from Canada and met with Karl and Ilene Egerman, along with executives of East End. After meeting with these doctors, Dr. Egerman asked East End if it would be interested in sponsoring the two new physicians at one time in a gross guarantee program along with himself. He indicated that he wanted both of them, although there were discussions about taking only one doctor at a time.
A September 4, 1978, memorandum from Robert C. Chapman, then executive vice-president of East End, to East End's board of directors recited in pertinent part:
 "Dr. Karl Egerman, a Pediatrician practicing in Trussville, has agreed to establish a group practice and take the two family practice physicians EEMH has recruited for Trussville into this group. In addition, Dr. Egerman has purchased land and started construction on a new physicians' clinic at a cost of $250,000.00. The establishment of this group and construction of the office building has been done to assist EEMH in reestablishing and expanding its market share in Trussville. Since the retirement of Dr. Thompson and the opening of the Carraway Services Clinic in Trussville, EEMH's patient load from Trussville has declined. The decline has been due to lack of family physicians in Trussville on EEMH's staff.
 "The opening of the Trussville Medical Clinic, P.A., in November, 1978, with Dr. Egerman and the two new family practice physicians (Dr. McClelland and Dr. Abramson) is greatly needed and should give a boost to EEMH's patient days. . . ."
East End agreed to sponsor all three doctors. The actual agreement is evidenced by the following letter to Egerman:
 "Karl E. Egerman, M.D. 116 South Chalkville Road Trussville, Alabama 35173
"Dear Dr. Egerman:
 "At the September 18, 1978, meeting of the East End Memorial Association Board of Directors the following guarantees, assistances and/or agreements were approved for the Trussville Medical Clinic, P.A.:
 "1. Guaranteed annual gross income of $240,000.00 for the first year of practice for three physicians. Gross income is defined as all income received from any source in rendering care to patients, teaching, etc., and is based on billings. Such payment by the Hospital, if any, shall be made as promptly as may be practicable following the end of the first year of practice. The Trussville Medical Clinic, P.A., agrees that its books, records, reports and accounts reflecting its gross billings for professional services and other income during this first year shall be made available to East End Memorial Hospital upon request to determine the Hospital's liability, if any, under this guarantee. Advances against the guarantee will be made upon request, but must be paid back at the end of the first year if the Hospital has no liability under this guarantee.
 "2. It is the intention of both parties that this agreement shall become effective on the date two Family Practice Physicians begin practicing *Page 41 
with Dr. Karl E. Egerman of the Trussville Medical Clinic, P.A., or on December 1, 1978, whichever occurs first.
 "3. Above-defined guarantees, assistances and/or agreements are contingent upon all physician members and/or physician employees of the Trussville Medical Clinic, P.A., maintaining an Active or Associate Staff position on the East End Memorial Hospital Medical Staff which includes obtaining and maintaining in force professional malpractice insurance coverage in the same amounts required for any member of the Medical Staff.
 "If the above are acceptable to you, please sign both copies and return the original to me for the Hospital's files.
 "We are looking forward to the opening of the Trussville Medical Clinic and to a long affiliation with your P.A.
"Sincerely,
 "/s/ Robert C. Chapman "Robert C. Chapman "Executive Vice President
"RCC/mh
"Accepted by:
 "/s/ Karl E. Egerman 10/4/78 _____________________ _______ "KARL E. EGERMAN, M.D. DATE
"Attested by:
 "/s/ Larry K. Anderson 10/4/78 ______________________ ________ DATE"
On the advice of Dr. Egerman's lawyer and his accountant, Dr. Egerman had formed the professional association called Trussville Medical Clinic, P.A. (hereinafter "TMC"), which was to employ Dr. Egerman and the other two physicians. It was established so that Dr. Egerman had total control.
Dr. Egerman searched for office space but could not find any that he considered satisfactory. A group of investors in Trussville offered to build Dr. Egerman a building that he could rent; however, this lease offer was well above the going rate. Additionally, Dr. Egerman was going to have to personally guarantee the lease for TMC. All of this being unsatisfactory to Dr. Egerman, he and his wife, Ilene, decided to personally buy land and build a facility for TMC to rent. The Egermans completed construction of the clinic and the gross guarantee program was begun in October 1978. Beginning with Dr. Egerman's first request for money assistance advances in October 1978, through the last request on February 4, 1980, Dr. Egerman received an undisputed $176,800.00 from East End.
In early 1979, within the guarantee program period, Dr. Egerman proposed the establishment of a satellite clinic in Odenville, Alabama. This satellite clinic was to be run by TMC and was to employ an additional physician. An additional gross guarantee of $80,000.00 was requested for Odenville by Dr. Egerman and it was approved by East End for this project; but Dr. Egerman never requested any funds for this clinic. Dr. Egerman and his wife bought some property in Odenville and purchased a specially built mobile home for an office. After only a few months of operation, Dr. Egerman sold the satellite clinic. He told East End that he had been talking with Brookwood Hospital about its buying the Odenville Clinic and he then offered to sell it to East End. East End agreed to purchase the Odenville Clinic from Dr. and Mrs. Egerman. The Egermans realized a $24,000.00 profit on the sale.
In February 1981, after the last money advance to TMC, East End began discussions with Dr. Egerman's representative concerning repayment of the $176,800.00 advanced to him. Dr. Egerman, through *Page 42 
an attorney, on March 16, 1981, advised East End that, basically, the guarantee had been made with TMC, not Dr. Karl Egerman as an individual, and that because of the financial situation of TMC, it was unable to repay any of the monies that had been advanced. The attorney stated that TMC was insolvent and was seriously considering filing a bankruptcy petition.
The attorney also claimed that East End had made misrepresentations to Dr. Egerman and that he had been caused to suffer financially because of his reliance on them. The attorney proposed to release East End of all possible liability in return for a cash payment in the sum of $20,000.00 to TMC. After further unsuccessful discussions, this lawsuit for recovery of the $176,800.00 was instituted against TMC and Dr. and Mrs. Egerman under various theories of contract, fraud, alter ego, and constructive trust. TMC answered, alleging that it did not owe the $176,800.00 because it had been misled or fraudulently induced by East End to establish and operate the Trussville clinic, and later filed a counterclaim based on fraud.
After full and lengthy discovery was had by all parties, this case was heard by a jury. When the trial proceedings of approximately one and one-half weeks were completed, the case was submitted to the jury by way of special interrogatories, with the jury acting in an advisory capacity as permitted by Rule 39(c), Ala.R.Civ.P., on the equitable issues. The special interrogatories asked if Dr. Egerman or TMC was liable to East End on a contract theory; if Dr. Egerman, Ilene Egerman, or TMC was liable to East End on a fraud theory; whether Dr. Egerman or Ilene Egerman was liable to East End on an "alter-ego" theory; and, on the counterclaim, whether East End was liable to Dr. Egerman and TMC under a fraud theory. The jury answered the questions by denying all claims of all parties.
East End filed a timely motion for judgment notwithstanding the verdict, or in the alternative, motion for new trial, on all of its legal issues for the court to consider along with the equitable alter-ego and constructive trust issues. After taking these matters under advisement, the trial court, in an opinion and order dated March 10, 1986, granted East End's motion for judgment notwithstanding the verdict, or in the alternative, motion for new trial and entered judgment against TMC on the contract theory in the amount of $176,800 plus interest of $66,555.00, denied East End's motion for judgment notwithstanding the verdict, or in the alternative, motion for new trial on its fraud claims, and held against East End on the equitable claims that Karl and Ilene Egerman should be held personally liable because they were merely an alter ego of the clinic.
 OPINION
The doctrine is well established, and obtains both in law and equity, that "a corporation is a distinct entity, to be considered separate and apart from the individuals who compose it, and is not to be affected by the personal rights, obligations and transactions of its stockholders; and this, whether said rights accrued, or obligations were incurred, before or subsequent to incorporation." Loper v.Gill, 282 Ala. 614, 615, 213 So.2d 674 (1968).
East End recognizes this well-established rule, but contends that "when the corporate form is being used to evade personal responsibility this Court has not been hesitant to disregard the corporate form and impose liability on the person controlling the corporation and subverting it to his personal use by the conduct of its business in a manner to make it merely his instrumentality," citing C.E.Development Co. v. Kitchens, 288 Ala. 660, 264 So.2d 510
(1972), and Cohen v. Williams, 294 Ala. 417,318 So.2d 279 (1975).
East End also says that "[a] separate corporate existence will not be recognized when a corporation is so organized and controlled and its business so conducted as to make it a mere instrumentality of another or the alter ego of a person owning and controlling it," and calls our attention toWoods v. Commercial Contractors, Inc.,384 So.2d 1076, 1979 (Ala. 1980). It also argues that "[a] corporation and the individual *Page 43 
or individuals owning all of its stock and assets can be treated as identical, even in the absence of fraud, to prevent injustice or inequitable consequences," citingBarrett v. Odom, May DeBuys, 453 So.2d 729, 732
(Ala. 1984).
East End recognizes the well-settled rule that when a trial court hears ore tenus evidence, as the trial court did here, every presumption will be indulged in favor of the trial court and its findings will not be disturbed on appeal unless palpably wrong or clearly erroneous; nevertheless, it contends that the rule is inapplicable in this case, because, it says, the essential facts are undisputed. It relies upon this Court's case of Samford v. FirstNational Bank of Montgomery, N.A., 431 So.2d 146, 149
(Ala. 1983).
East End argues that the undisputed evidence before the trial court establishes that TMC was so organized and controlled and its business so conducted as to make it a mere instrumentality of the Egermans or the alter ego of the Egermans and that the Egermans used TMC for their own benefit and gain while avoiding personal liability. East End argues that the Egermans charged an unreasonable amount of rent for use of their building, that they treated other tenants better than TMC was treated, that they misused TMC for personal gain, that TMC paid all of the Egermans' bills at the Pine Tree Country Club, that Dr. Egerman was the only employee of TMC who was given a car, that Dr. Egerman was paid an arbitrary salary that was not related to TMC's income, that the Egermans failed to observe corporate formalities, and that TMC was severely undercapitalized.
The Egermans argue that they proved not only to the satisfaction of the advisory jury, but also to the trial court, that they did not use TMC as a subterfuge or to commit a wrong. They assert that TMC was not formed for the sole purpose of avoiding personal liability while they benefited through the use of the corporate name. The Egermans contend that in order to pierce a corporate veil, a party must either demonstrate fraud or show that the recognition of the corporate form will result in injustice or inequitable consequences, and the Egermans argue that East End failed to show either.
The trial judge, after reviewing the evidence, wrote an extensive opinion, in which he set out the contentions of the parties, the legal principles involved, and his own findings of fact. Portions of that order read as follows:
"In the present case, the jury's verdict then was merely advisory with respect to East End's claims against Karl and Ilene Egerman based on the 'alter ego' theory or 'piercing the corporate veil' theory. This Court must decide for itself under equitable principles whether East End is entitled to a judgment against the Egermans under this theory.
"As the principal ground in support of its argument that Karl and Ilene Egerman should be held liable for the debt of TMC, East End by its counsel states that TMC was established without adequate capital to carry out its operations. East End says that the fact that TMC was without adequate capital is sufficient basis in itself to ignore the corporate entity and hold the Egermans liable for the debt. East End cites a number of decisions and law articles to support its argument. Those include The Christian Craft Grocery Co. v.Fruitdale Lumber Co., 121 Ala. 340 [25 So. 566] (1899);Dixie Coal Mining Mfg. Co. v. Williams, 221 Ala. 331,128 So. 799 (1930); Harris v. First Nat'l Bank ofTuscumbia, 227 Ala. 86, 149 So. 86 (1933); Appelbaumv. First Nat'l Bank of Birmingham, 235 Ala. 380,179 So. 373 (1938); Ledlow v. Goodyear Tire Rubber Co. ofAlabama, 238 Ala. 35, 189 So. 78 (1939); Forest HillCorp. v. Latter Blum [, Inc.], 249 Ala. 23,29 So.2d 298 (1947); C.E. Dev. Co. v. Kitchens, 288 Ala. 660,264 So.2d 510 (1972).
"An analysis of these decisions, however, shows that there was other evidence of abuse of the corporate entity besides the inadequate capital of the corporation to sustain the court's decisions."
The court then analyzed and distinguished some of the cited cases, and included some others. The order continued: *Page 44 
"In Kwick Set Components v. Davidson Industries [,Inc.], 411 So.2d 134 (Ala. 1982), Davidson sought to hold a parent corporation liable for the debt of its subsidiary. Affirming a judgment for Davidson, the Supreme Court established the test in broad terms:
 " 'First, the dominant corporation must have controlled the subservient corporation, and second, the dominant corporation must have proximately caused plaintiff harm through misuse of this control.'
"In the present case, inadequate capital cannot be a basis for disregarding TMC's corporate existence. In Latta,Disregarding the Entities of Closely Held andParent-Subsidiary Corporate Structures, 12 Cumb.L.Rev. 155, 165 (1981), the author discusses adequacy of capitalization as follows:
 " 'Furthermore, where adequacy of capitalization is an issue, courts tend to approach voluntary and involuntary creditors differently. Involuntary creditors, such as tort victims, cannot choose the perpetrator of their misfortune. Voluntary creditors, on the other hand, are generally able to inspect the financial structure of a corporation and discover potential risks of loss before any transaction takes place. Consequently, courts are less sympathetic with voluntary creditors who, having had the opportunity of inspection, nevertheless elected to transact with an undercapitalized corporation.'
"In Tigrett v. Pointer, 580 S.W.2d 375, 382
(Tex.Civ.App. 1978), the Court of Civil Appeals of Texas stated:
 " 'Inadequate capitalization by itself may not be a sufficient ground to pierce the corporate veil. Associates Dev. Corp. v. Air Control Products, Inc., 392 S.W.2d 542, 545
(Tex.Civ.App.-Austin, 1965, writ ref'd N.R.E.). Thus, a party who has contracted with a financially weak corporation and is disappointed in obtaining satisfaction of his claim cannot look to the dominant stockholder or parent corporation in the absence of additional compelling facts. Bell Oil Gas Co. v. Allied Chem. Corp. 431 S.W.2d 336, 340 (Tex. 1968); Hanson Southwest Corp. v. Dal-Mac Construction Co., 554 S.W.2d 712, 717 (Tex.Civ.App.-Dallas 1977, writ ref'd N.R.E.). . . .
"* * * *
"In the present case, no evidence has been presented to show that East End asked for financial information on TMC or any personal guarantees from its stockholders or officers. When East End made advances against the guarantees, it could have ascertained by the exercise of reasonable diligence that TMC had limited capital. In fact, Chapman, East End's President, testified that the advances were made by East End under the gross guarantees to bridge the time lag between collections and billings.
"In its letter agreement with TMC, East End expressly reserved the right to inspect TMC's books to verify the gross billings. However, East End did not reserve the right to check on TMC's financial condition before making cash advances. It could have but did not require TMC to maintain a minimum net worth.
"East End could have easily discovered the extent of TMC's capital or financial resources. East End cannot now complaint [sic] about TMC's inadequate capital when it did not rely on TMC's capital resources initially in making the cash advances.
"East End also argues that the Egermans caused it harm by their misuse of TMC's corporate form; i.e., that the Egermans used TMC's assets and the money advanced TMC by East End for their personal benefit. As evidence of such misuse, East End contended during the trial that the Egermans rented their clinic building to TMC at an exorbitant rental; that Karl Egerman's salary from TMC in the amount of $60,000.00 was excessive; that TMC was caused to pay the Egermans' personal country club expenses of $5,978.00; that TMC was caused to pay $3,900.00 for Ilene Egerman's Honda automobile and that this price was in excess of its market value at the time of purchase; that Karl Egerman also rented equipment to TMC at an excessive rental.
"Before East End committed itself to the gross guarantee and to making advances *Page 45 
under the gross guarantee, it knew that the Egermans had purchased the land and were constructing the clinic building which they intended to lease to TMC. Since East End knew that TMC was wholly owned by Karl Egerman, it knew at that time that there was a basic conflict in a transaction between the Egermans and TMC. However, East End made no objections to the lease arrangement. Furthermore, a rental of $9.00 per square foot for a new building in October, 1978, was within the range of a reasonable rental, provided that the landlord paid for taxes, insurance, building maintenance and cleaning services. The imposition of these additional expenses are in excess of what could be considered a reasonable rental. However, the total of all these expenses should not have exceeded $15,000.00, and there is some question whether they would have been that high. In 1981, East End itself leased 2,000 square feet in Egerman's building at a rental of $9.00 per square foot, or $18,000.00 per year. The difference was that Egerman paid for all taxes, insurance, maintenance and cleaning services.
"According to the evidence, the equipment for the building was purchased by Egerman for $46,000.00. Egerman borrowed the amount needed for the purchase of the equipment and undertook an obligation to pay monthly payments to the bank in the amount of $901.46. TMC was caused to rent the equipment from Egerman and to make monthly payments of rent to Egerman in the amount of $901.46, or $12,620.00 per year. To the extent that such equipment would have value upon payment in full of the obligation assumed by Egerman to purchase the same, Egerman will have benefited rather than TMC. It has not been established that this amount would be significant in relation to the total amount of advances made by East End to TMC.
"There was also evidence that Egerman's salary was $60,000.00 and that TMC was caused to expend the sum of approximately $6,000.00 for country club dues and expenses. Entertainment expenses at country clubs have been allowed by the Internal Revenue Service as deductible expenses from income. To the extent that such expenses incurred by the Egermans represented entertainment of patients or doctors TMC was recruiting for employment by it, the country club expenses could properly be incurred and paid by TMC. It appears that at least a part of these expenses had no relation to TMC's business and were therefore personal expenses of the Egermans. To that extent, charging such expenses to TMC was improper and a misuse of TMC's assets.
"The Honda automobile was purchased by TMC from Ilene Egerman for $3,900.00. It is questionable whether the automobile had a value as high as that at the time when TMC was caused to purchase it. Nevertheless, the overpayment for the automobile is relatively insignificant in view of the total amounts involved here.
"This Court concludes also that Karl Egerman's salary of $60,000.00 was not unreasonable in view of his background and experience and the amounts earned by other employee physicians employed by TMC.
"There is also the copy of the statement rendered by TMC's accountant, John campbell, dated April 2, 1980, which included in the description of consultation services provided by Campbell the following:
 " '. . . Research and analyze potential bankruptcy of P.A. to relieve P.A. of debt to East End Hospital. . . . Preparation of analysis to determine the potential liability to East End Hospital and calculation of alternative methods of debt forgiveness resulting from guarantees issued by East End Hospital. . . .'
"Since the preceding bill was rendered by Campbell on March 4 [sic, April 2], 1980, the discussion or consultation referred to in his bill must have taken place between March 4 [February] and April 2, 1980. The cash advances made by East End for which it now makes claim had already been made at that time. Furthermore, nothing in the statement indicates a prior intention on the part of the Egermans to drain TMC of its assets and then cause it to file for bankruptcy proceedings. *Page 46 
"Having considered the evidence, this Court is not reasonably satisfied that the corporate entity of TMC was used solely to avoid personal liability by the Egermans while preserving to them the benefits gained through the letter agreement with East End. See, e.g., Woods v. CommercialContractors, Inc., 384 So.2d 1076, 1079 (Ala. 1980).
"In accordance with this opinion, the motion for judgment notwithstanding the verdict is hereby granted with respect to the claim of East End Memorial Association against Trussville Medical Clinic, P.A. Alternatively, pursuant to Rule 50(a), Alabama Rules of Civil Procedure, the motion for new trial filed by East End Memorial Association is conditionally granted with respect to the claim of East End Memorial Association against Trussville Medical Clinic, P.A., in the event the above judgment notwithstanding the verdict is hereafter vacated or reversed.
"The motion for judgment notwithstanding the verdict or, alternatively, for the new trial filed by East End Memorial Association is overruled with respect to the claims asserted by East End Memorial Association against Karl E. Egerman and Ilene Z. Egerman. . . ."
We are of the opinion that the evidence was in dispute and that there was evidence to support the trial court's findings of fact, and that the trial court's conclusions of law are supported by adequate authority; therefore, we hold that the trial court did not err in refusing to pierce the corporate veil in this case, or in refusing to establish a constructive trust, and likewise did not err in granting East End's motion for judgment notwithstanding the verdict, or in the alternative for a new trial, in favor of East End against TMC on East End's contract claim, and in entering a judgment against TMC on that claim. The judgment of the trial court, therefore, is due to be affirmed.
Accordingly, the motion to dismiss the appeal is denied without addressing the merits of the contentions in support of that motion. See, Sumlin v. Hagan Storm Fence Co. ofMobile, 409 So.2d 818 (Ala. 1982).
AFFIRMED.
ALMON, BEATTY, ADAMS and STEAGALL, JJ., concur.
[1] For example, considering a gross guarantee of $80,000.00, if a doctor had been advanced or loaned some $20,000.00 during the year and he had earned only $70,000.00 by the end of that year, subtracting the $10,000.00 that East End would owe the doctor because he did not meet the $80,000.00 guarantee from the $20,000.00 advancement or loan, the doctor would then owe East End only $10,000.00 at the end of the year. The doctor would be given the option to repay the $10,000.00 at that time or work out a repayment schedule.