This is an appeal from an order granting a new trial on the condition that the plaintiff refuses to accept a remittitur reducing the jury's award from $1,300,000 to $300,000 in an action for breach of contract and fraud. The judge, on motion for a new trial, ruled that the verdict necessarily included punitive damages referable to the fraud claim and that the weight of the evidence would not support the fraud claim. He reasoned that $300,000 was the most that the jury could have reasonably given on the contract claim and granted a new trial unless the plaintiff accepted a remittitur of $1,000,000.
This case concerns an unwritten joint venture agreement to build a cable television system and written contracts for the exclusive right to operate a local channel and the right to sell advertising on the local channel.
Although disputed in many respects, the evidence tended to show that during the summer of 1984, the plaintiff Gary Porter became interested in developing a cable television system in the Jackson-DeKalb County area. Porter learned that the defendant, Roth Hook of Aliceville, was in the cable television business. In October 1984 he telephoned Hook and discussed the prospect of constructing the system. In April 1985 Hook visited the Jackson-DeKalb County area. Shortly after his visit, Charles Hubbard, one of Hook's technical assistants, visited the area.
In June 1985 Porter and Hook met in Centreville at the office of David Daniel, who owned a local channel on Hook's Centreville cable system. At this meeting, it was agreed that Porter would obtain the franchises for newly named "Mountaineer Cable Television" from Jackson and DeKalb Counties and from the towns to be served by Mountaineer. Porter was also to obtain pole rights from Sand Mountain *Page 384 
Electric Cooperative and the Farmers' Telephone Cooperative. Hook agreed to send a construction crew and the cable for the system to Jackson County.
Porter alleges that other agreements were made during the meeting. He testified that Hook agreed to make Porter general manager of the system; that the tower and a building to house the offices and "head end" equipment were to be constructed at Porter's expense on property owned by Porter; and that Hook would pay Porter 2% of the cost of the building annually for 30 years. Porter also testified that the parties agreed that Porter was to invest $50,000 for the "head end" equipment and that Hook told him that he could own the system within 5 years if he wished to purchase it.
In September 1985 Porter discovered that Hook had decided that Porter was to be sales manager instead of general manager. Porter contacted Hook and was told that the change was made because Porter would make more money as sales manager. A meeting was scheduled between Porter and Hook, at which time Hook allegedly offered to allow Porter to own the local channel on Mountaineer.
In October 1985, after Porter had completed construction of the building and the tower on his property, he discovered that Hook had entered into a lease agreement with someone else for a site to construct a tower. When asked about the new site for the tower, Hook told Porter that the tower would be relocated but that the office would remain on Porter's property. Shortly thereafter, Porter learned that Hook had entered into a lease with someone else for a building to house the office and the "head end" equipment. Hook entered into those leases notwithstanding the prior agreement with Porter to locate the facilities on Porter's property, and he did so without informing Porter of the changes.
In May 1986 the system began broadcasting. A dispute arose between Porter and Hook over the amount owed to Porter for his efforts as sales manager. Porter claimed that Hook owed him $8,000, but Hook had paid him only $4,000.
In August 1986 Porter approached Hook about broadcasting local high school football games on the local channel. Hook agreed, and Porter purchased the equipment to begin operating the local channel. The equipment was installed, and the local channel began operations. Porter entered into an agreement with a local radio station to broadcast the station's audio signal on the local channel while showing classified advertisements.
In September 1986 Hook instructed Porter to cease broadcasting the radio signal. Porter complied. Several days later, Porter was informed by one of Hook's employees that the local channel was being disconnected and that he was being fired as sales manager. Porter requested that he be allowed to turn the local station off in the "downstream mode" so as to prevent damage to his equipment. He was not allowed to do this. The locks on the door where Porter's equipment was stored were changed, preventing Porter's entry.
In October 1986 Porter commenced this action. A temporary restraining order was issued, ordering Hook and his employees to allow Porter access to the equipment and to allow him to resume broadcasting so that he could fulfill his commitments. Porter testified that, in spite of the order, he was denied access to his equipment on numerous occasions.
The standard for appellate review of an order granting a new trial on the sole ground that the verdict is against the great weight and preponderance of the evidence was set forth inJawad v. Granade, 497 So.2d 471 (Ala. 1986):
 "[A]n order granting a motion for new trial on the sole ground that the verdict is against the great weight or preponderance of the evidence will be reversed for abuse of discretion where on review it is easily perceivable from the record that the jury verdict is supported by the evidence."
497 So.2d at 477. We must review the record to determine if support for the jury's finding of fraud is easily perceivable.
The elements of fraud are: *Page 385 
 "(1) [F]alse representation (2) of a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result of the misrepresentation. Earnest v. Prichett-Moore, Inc., 401 So.2d 752 (Ala. 1981). If fraud is based upon a promise to perform or abstain from performing in the future, two additional elements must be proved: (1) the defendant's intention, at the time of the alleged misrepresentation, not to do the act promised, coupled with (2) an intent to deceive. Clanton v. Bains Oil Co., 417 So.2d 149
(Ala. 1982)."
Pranzo v. ITEC, Inc., 521 So.2d 983, 984 (Ala. 1988), citingCoastal Concrete Co. v. Patterson, 503 So.2d 824, 826
(Ala. 1987).
In its order granting Hook's motion, the trial court stated:
 "The fraud claim submitted to the jury was that of a promise to perform a future act or acts with the intent to deceive and with no intent at the time of the promise to perform the act. There is evidence from which the jury could rationally infer that the defendant made a material promise or promises, that the plaintiff reasonably relied upon them, and that, at least according to the plaintiff, the promised act or acts were not performed, to the damage of the plaintiff.
 "The defendant strenuously contends, however, that the evidence regarding the intent of the defendant at the time of such promise or promises is insufficient to sustain the verdict. This court has carefully reviewed the transcript with a view to gleaning from it any evidence that the defendant, at the time of the alleged promises, had the intent to deceive the plaintiff and not to perform the acts promised. . . . This court finds, at most, an agreement or agreements which the defendant subsequently did not perform, and that the verdict of the jury, to the extent that it may represent a finding of such fraudulent intent, is contrary to the great preponderance of the evidence. In this respect, the motion for new trial is due to be granted."
We agree with the trial court's conclusion that there was evidence that Hook made promises of material fact, that Porter reasonably relied on the promises, and that Porter was damaged as a result of Hook's failure to perform. We disagree, however, with the trial court's conclusion that it was against the weight of the evidence for the jury to find that Hook intended not to perform and intended to deceive Porter.
Hook testified that when he decided to abandon his agreement to locate the office and tower on Porter's property he "realized [he] didn't want to be in Mr. Porter's backyard on anything on a permanent basis or temporary basis." However, he continued making promises to Porter after that. Porter testified that, when he approached Hook concerning the relocation of the tower, Hook said that he would leave the office in the building on Porter's land. At that time, Hook was negotiating a lease for another building.
Shortly after Hook told Porter that he could operate the local station, Porter asked for a written contract. Hook refused to enter into a written contract because, he said, "I wasn't going to enter into any kind of contract with a man like Gary Porter that had proven to me as far as I was concerned [sic]." Although Hook had reached this decision, he continued to tell Porter that he could operate the local channel.
Possibly the most damning admission made by Hook was as follows:
 "Q It's your testimony to this jury that from the first time that you ever met Mr. Porter, you didn't intend to enter into any contract with him, did you?
"A No. That's not what I said.
"Q What did you say?
 "A I said after I learned what kind of character Mr. Porter was, I didn't want to get into any contract with him.
 "Q Now, if you would, tell us when you learned that.
". . . .
 "A When I first came up here and first started planning to get on the air.
 "Q You mean back in early 1985, you found out this guy was a culprit? *Page 386 
 "A I don't have it written down what day I talked to that friend of mine.
"Q Give us your best judgment.
"A September or October of that year.
"Q Of 1985?
"A Yes, sir." (Emphasis added.)
Although Hook reached this decision in September or October 1985, he continued making promises to Porter. We hold that, from this testimony, as well as the other evidence in the record, it is easily perceivable that the verdict is supported by the evidence and we conclude that the trial court erred in granting Hook's motion for new trial.
Because we reverse the trial court's ruling on the fraud claim, we will review the award for excessiveness.
In Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989), this Court set forth several factors that could be taken into consideration in determining whether an award of punitive damages is excessive. Among those factors are the financial position of the defendant and the principle that "if the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss." 539 So.2d at 223. This statement of the law is not exactly apposite to this case, because Hook's profit from the sale of Mountaineer Cable was not necessarily or directly related to the fraud alleged by Porter. Nevertheless, it leads us to the conclusion that the punitive damages are not excessive. Hook sold Mountaineer Cable for a sum in excess of $5,000,000. It appears that a substantial amount of that sum was profit. In light of the profit received by Hook from the sale of the system, as well as a comparison to other cases in which this Court has upheld punitive damages awards, we hold that an award of $1,000,000 in punitive damages in this case is not excessive.[1]
Porter also argues that the trial court erred in refusing to allow his claim for attorney fees. "The general rule in Alabama and most other jurisdictions is that attorneys' fees are not recoverable as damages, in the absence of a contractual or statutory duty, and a few other exceptions on equitable principles." George E. Jensen Contractor, Inc. v. Quality MillWorks, Inc., 431 So.2d 1232, 1234 (Ala. 1983); HighlandsUnderwriters Insurance v. Eleganté Inns, 361 So.2d 1060
(Ala. 1978); State v. Alabama Public Service Commission,293 Ala. 553, 307 So.2d 521 (1975). But cf. Reynolds v. FirstAlabama Bank of Montgomery, 471 So.2d 1238 (Ala. 1985) (beneficiaries of trust awarded attorney fees where trustee acted fraudulently). No evidence was presented of any contract between Porter and Hook providing for attorney fees in the event of litigation, nor is there a statute that provides for attorney fees in a fraud case. Neither does this case fit into one of the equitable exceptions. We hold that the trial court did not err in refusing to award attorney fees.
The order denying attorney fees is affirmed, but the order granting a new trial is reversed, and the cause is remanded to the trial court for the entry of a judgment for the amount of the jury verdict.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.
HORNSBY, C.J., and MADDOX and STEAGALL, JJ., concur.
ADAMS, J., concurs specially.
[1] In addition to the two factors mentioned, we have also considered the award in light of the remaining factors set forth in Green Oil and our holding in Hammond v. City ofGadsden, 493 So.2d 1374 (Ala. 1986).