Exxon Corporation leased a fixed base operation[1] at Dannelly Field Montgomery Municipal Airport ("the Airport") from the Montgomery Airport Authority ("the Authority"), a public corporation organized under the provisions of Ala. Code 1975, §4-3-1 et seq. That corporation was organized for the purpose of operating and maintaining the Airport.[2] Exxon subleased the facility to Epps Aircraft, Inc. ("Epps"). Subsequently, Epps purchased a Thrifty Car Rental franchise and began to operate an automobile rental service from its facility.
Exxon is obligated under the primary lease to pay as a rental fee $1,000 per month or, based upon a sliding scale, a percentage of its gross monthly income, whichever is larger.[3] The primary lease does not directly authorize Exxon to operate an automobile rental company at the Airport; it does, however, provide, in pertinent part, as follows:
 "In addition to the foregoing, and not in limitation thereof, the Tenant may, at its option, provide other services and sell other products, including the following:
". . . .
 "The right to load and unload passengers and cargo and to transport passengers to and from transient aircraft to and from the terminal and other areas of the Airport;
". . . .
 "Such other services and sale and rental of such other items as from time to time may be handled by Fixed Base Operators generally;
". . . .
 ". . . The Tenant shall have the right of ingress to and egress from and over the entire Airport property on any and all roads and/or access therein and thereto which the Landlord controls leading thereto and therefrom which shall be for the benefit of and may be exercised by the Tenant, its employees, passengers, guests, patrons, and other invitees and licensees subject to the reasonable rules and regulations of the Airport Director."
Epps considered that the provisions of the primary lease quoted above, which were incorporated into the sublease, authorized it to operate the automobile rental service from its facility.
Epps included the gross income from its automobile rentals in calculating its rent under the sliding scale set out in the sublease, which was identical to the sliding scale set out in the primary lease; however, at the time Epps purchased its automobile rental franchise, other automobile rental companies doing business at the Airport — three of which operate solely out of the terminal and one of which operates out of both the terminal and another fixed base operation — were paying monthly rental fees equal to 10% of their gross incomes, pursuant to agreements that were apparently executed subsequent to the execution of Epps's sublease.
Taking the position that the primary lease did not authorize Epps to operate an *Page 627 
automobile rental service from its facility, the Authority adopted a resolution that reads, in pertinent part, as follows:
 "WHEREAS, the Authority finds that, in order to retire debts incurred for the construction of facilities, pay for Airport equipment and maintenance, protect the public, preserve order, provide for the public health, safety and welfare, and govern the Airport, it is necessary to fix charges, fees and regulations for those persons and corporations who do not have leases or concession contracts with the Authority, including but not limited to non-tenant rental car businesses, and hotel/motel operators who desire the privilege of picking up passengers in courtesy vehicles and supplying services to passengers picked up at the Airport; and
 "WHEREAS, any business that does not lease space in the Airport passenger terminal at Dannelly Field, Montgomery, Alabama, and desires access to the terminal through the use of Airport roads to conduct its business shall be deemed a non-tenant business. This definition includes but is not limited to motel courtesy vehicles and car rental companies not renting counter space within the terminal building; and
". . . .
 "WHEREAS, the Authority finds that the charges and fees established and fixed herein for non-tenant rental car businesses and motel courtesy vehicles are reasonable compensation from the users to the Authority for the use of Airport facilities, and are needed to help defray the cost of Airport operations and facilities; and
 "WHEREAS, the Authority has heretofore entered into contracts for rental car concessions with persons or corporations wishing to use any of the four designated rental car business areas in the passenger terminal, with said contracts being on file at the Administration Offices of the Authority; and
 "WHEREAS, the aforementioned rental car concession contracts have reasonable requirements, regulations, charges, and fees for the privilege of supplying goods, commodities, and services at the Airport, based on the property and improvements used, the expenses of Airport operation, the cost of Airport facilities, including Authority debt retirement; and
 "WHEREAS, rental car businesses not having said rental car concession contracts may, nevertheless, desire the privilege of supplying services at the Airport, such as driving on Airport roads, and [picking up] and dropping off customers at the Airport; and
 "WHEREAS, the Authority finds that, in order to protect the public, to provide for public safety, to preserve the good order and peace of the Authority, to regulate the entrances to property and buildings of the Authority and the way of ingress and egress to and from the same, and in order to enhance the accuracy of the levying and collecting of fees and charges by the Authority on non-tenant rental car business, it is necessary to enact reasonable standards, controls, rules, regulations, and procedures for such non-tenant rental car business; and
 "WHEREAS, the Authority finds that, in consideration of all the foregoing, it is necessary to fix and establish reasonable charges, fees, rules, regulations, standards, controls, and procedures for non-tenant persons or corporations with rental car businesses, and motels desiring to furnish courtesy vehicles, desiring access to Airport property for business purposes.
 "NOW, THEREFORE, BE IT RESOLVED by the MONTGOMERY AIRPORT AUTHORITY as follows:
 "Section 1. In order to retire Authority debts incurred for the construction of Airport facilities, pay for Airport operations and maintenance, manage the Airport, pay for Airport equipment, protect the public, preserve order, provide for the public health, safety and welfare, enhance the welfare of the Authority, and govern the Airport, it is necessary to fix charges, fees and regulations for those persons and corporations who do not have leases or concession contracts *Page 628 
with the Airport Authority, including but not limited to non-tenant rental car businesses and motel courtesy vehicles, but who want the privilege of picking up and delivering passengers and supplying services at the Airport.
". . . .
 "Section 3. The charges and fees established and fixed herein are reasonable compensation from the users to the Authority for the use of Airport facilities and are needed to help defray the cost of Airport facilities.
 "Section 4. In order to protect the public, to provide for public safety, to preserve the good order and peace of the Authority, to regulate the entrances to property and buildings of the Authority and the way of ingress and egress to and from same, and in order to enhance the accuracy of the levying and collection of fees and charges by the Authority on non-tenant businesses, it is necessary to enact reasonable standards, controls, rules, regulations, and procedures for such non-tenant rental car businesses.
". . . .
 "Section 6. A non-tenant rental car business is defined as a rental car business not having one of the rental car concession contracts or leases with the Authority for the privilege of having offices and counter space in the terminal or terminal building from which to conduct rental car business.
 "Section 7. Reasonable regulations, controls, charges, fees, standards, rules and procedures in consideration of all the aforementioned reasons, purposes and factors for non-tenant businesses are as follows:
 "1. Any person or entity desiring access to the Airport for the purpose of conducting any business operations, either directly or indirectly, shall first obtain from the Authority a Non-Tenant Business Permit prior to conducting any such business on Airport property.
". . . .
 "3. The Authority may issue a Non-Tenant Business Permit only upon receipt of a signed and verified application from the rental car business owners containing the following information, agreements and proof:
". . . .
 "F. A written agreement to pay to the Authority for the duration of the permit the same percentage of all gross business receipts derived from the rental of vehicles to passengers from the Airport, as is being paid by Rent-A-Car Companies located within the terminal, payable on or before the 25th day of each month for the preceding month's receipts.
". . . .
 "5. A Non-Tenant Business Permit shall not permit a business to have an office or station on Airport property or to park cars on Airport property. Any or all of these actions and activities are expressly prohibited."
Epps sued the Authority, seeking a judgment declaring that it was not bound by the requirements of the resolution.[4] The Authority counterclaimed, seeking a money judgment against Epps for the amount that it alleged had accrued under the resolution. After considering the facts, which were stipulated, as well as various exhibits, the trial court ruled that Epps had failed to prove that automobile rental services fell within the lease category of "[s]uch other services . . . and rental of such other items as from time to time may be handled by Fixed Base Operators generally," and, therefore, that it had failed to prove that it was entitled to provide the automobile rental service under the terms of the primary lease and the sublease. Accordingly, the trial court declared Epps to be subject to the requirements of the resolution, and it entered a judgment for the Authority on its *Page 629 
counterclaim.[5] Epps appealed. We reverse and remand.
As stated, this case was submitted to the trial court on stipulated facts. No testimony was taken; therefore, there is no presumption that the judgment was correct. This Court sits in judgment on the evidence in the same manner as did the trial court. Pennington v. Bigham, 512 So.2d 1344 (Ala. 1987).
Epps's principal contention is that it is authorized under the terms of the primary lease (i.e., under the provisions in the lease that authorize it to provide "[s]uch other services . . . and rental of such other items as from time to time may be handled by Fixed Base Operators generally," and to use the Airport's roads) to engage in the automobile rental business and to use the Airport's roads for that purpose. It argues that the resolution constitutes an attempt on the part of the Authority to avoid its obligations under the primary lease and, therefore, that it violates Article I, § 22, of the Alabama Constitution of 1901. On the other hand, the Authority contends that Epps is not entitled under the terms of the primary lease to engage in the automobile rental business from its facility at the Airport. It argues, therefore, that Epps is subject to the requirements of the resolution.
The resolution fixed a charge of 10% of gross income on "non-tenant" automobile rental companies. A "non-tenant" automobile rental company is defined in the resolution as "a rental car business not having one of the rental car concession contracts or leases with the authority for the privilege of having offices and counter space in the terminal or terminal building from which to conduct rental car business," but "desir[ing] access to the terminal through the use of Airport roads to conduct its business." A careful review of the resolution shows that its primary purpose is to regulate the use of the Airport's roads by "non-tenant" automobile rental companies by requiring them to pay "the same percentage of all gross business receipts derived from the rental of vehicles to passengers from the Airport, as is being paid by Rent-A-Car Companies located within the terminal."[6]
Epps is doing business at the Airport as a "non-tenant" automobile rental company within the meaning of the resolution. Under the primary lease, Epps has the right to provide "[s]uch other services . . . and rental of such other items as from time to time may be handled by Fixed Base Operators generally." Epps also has a right under the primary lease "of ingress to and egress from and over the entire Airport property on any and all roads . . . which the Landlord controls . . . subject to the reasonable rules and regulations of the Airport Director,"[7] and also the right "to transport passengers to and from transient aircraft to and from the terminal and other areas of the Airport."
Our review of the evidence, particularly an exhibit entitled "AOPA's Airports USA 1988," causes us to disagree with the trial court's conclusion that Epps failed to prove that automobile rental services fell within the lease category of "[s]uch other services . . . and rental of such other items as from time to time may be handled by Fixed Base Operators generally." The word "general" is defined in Black's LawDictionary (5th ed. 1979), as "[e]xtensive or common to many." The exhibit, which is a compilation of information about airports and airfields in the United States, characterizes automobile rentals as a "general service" provided by many fixed base operators, including those that operate at airports with terminals from which other *Page 630 
automobile rental companies do business. We hold, therefore, that Epps is entitled, under the aforementioned terms of the primary lease, to operate an automobile rental business at its facility and to use the Airport's roads in the pursuit of that business.[8] To hold otherwise would be to allow the Authority, which derives its power directly from the Legislature, to avoid its contractual obligations under the primary lease, in violation of Article I, § 22, of the Alabama Constitution ("no . . . law, impairing the obligations of contracts, shall be passed by the legislature").
Furthermore, we note that the Airport, originally owned by the City of Montgomery, was conveyed by the City to the Authority "subject to . . . rights of way for roads." Ala. Code 1975, § 4-3-11(19), by which the Legislature conferred certain powers on the Authority, provides as follows:
 "The authority shall have the following powers, together with all powers incidental thereto or necessary to the discharge thereof in corporate form:
". . . .
 "To fix, establish, collect and alter landing fees, tolls, rents and other charges for the use of any airport, heliport, landing area, building, structure, facility or other property owned or controlled by the authority."
The rights-of-way that were providing public access to the Airport at the time it was conveyed to the Authority are not, by virtue of the reservation in the deed, "owned or controlled" by the Authority. The Authority, which, as previously stated, is a creature of the Legislature and whose powers are delineated by statute, lacks the power to charge a fee for, and thus impede, the use of those rights-of-way.
Because the judgment with respect to the other allegations made by Epps was based solely upon the trial court's determination that Epps was subject to the requirements of the resolution, we pretermit any discussion concerning the merits of those allegations. The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HORNSBY, C.J., and JONES, SHORES and KENNEDY, JJ., concur.
[1] A fixed base operation is a commercial facility that offers a variety of services primarily to pilots and passengers of general aviation aircraft.
[2] The City of Montgomery had conveyed the Airport to the Authority.
[3] Under the sliding scale, Exxon is obligated to pay 4% of the first $20,000 of gross sales per month, plus 3% of the next $20,000, plus 2% of the next $10,000, plus 1% of all other gross sales per month above $50,000.
[4] Epps filed a multi-count complaint in which it also alleged 1) that it was entitled to specific performance of the primary lease; 2) that the Authority was estopped to claim 10% of the gross income generated by its automobile rental business; 3) that the Authority had interfered, and conspired to interfere, with several of its contracts; and 4) that the Authority was guilty of illegally controlling the prices of automobile rental services provided at the Airport.
[5] The trial court ruled that because Epps was subject to the requirements of the resolution, its other allegations were without merit.
[6] The resolution expressly prohibits a "non-tenant" automobile rental company from having an office or station at the Airport and from parking automobiles at the Airport. The Authority has not taken the position that this prohibition bars Epps from operating an automobile rental service out of its facility.
[7] We do not interpret the words "subject to the reasonable rules and regulations of the Airport Director," which are used from time to time in the primary lease, as conferring a right on the Authority to increase Epps's rent.
[8] The sublease contains the following provision, which, we note, is not contained in the primary lease:
 "In the event, for any reason, the City of Montgomery or any other lawful authority limits, restricts or prohibits any activity permitted hereby, then the Lessee agrees to comply with such restriction, limitation or prohibition, provided, however, that upon the imposition of such restriction, limitation or prohibition, either party may at any time thereafter cancel and terminate this sublease, without liability to the other party, and rents shall be prorated to the date of such cancellation."
 This provision did not form the basis for the trial court's judgment. Because the trial court did not rule as to the legal effect of this provision, we pretermit discussion of it.