Huntsville Aviation Corporation appeals from a summary judgment against it on its claims against two defendants, Thomas S. Ford and Madison Investment Company, Inc., for damages based on an alleged breach of a lease or for the value of the defendants' use and occupation of its premises. Its claims against a third defendant, Aviation Services, Inc., remained pending when this appeal was taken.[1] Ford is the majority stockholder of Madison Investment and the sole stockholder of Aviation Services. The principal question is whether Huntsville Aviation should be held to have dealt solely with Aviation Services and so to have recourse solely against that corporation, or whether, under the evidence submitted, Aviation Service's separate corporate existence might be disregarded and Huntsville Aviation allowed to recover against Ford and Madison Investment. The complaint also included claims alleging that Huntsville Aviation was a third-party beneficiary to a contract between Madison Investment and the Huntsville-Madison County Airport Authority ("the Airport Authority") and that it was a victim of fraud committed by Ford, and Huntsville Aviation also appeals from the judgment against it on those claims.
Huntsville Aviation is a fixed-base operator[2] at the Huntsville-Madison County Airport and rents a hangar and other space from the Airport Authority. Aviation Services was incorporated on January 17, 1984. Beginning about that time, Ford did business with Huntsville Aviation concerning a Cessna 182 airplane, primarily purchases of fuel and repairs. Ford asserted in deposition that those purchases were made through Aviation Services, which owned the airplane, but William Whatley, the vice president and general manager of Huntsville Aviation, stated in deposition that "We had a separate account set up for him for Madison Investment Company that we billed his fuel and maintenance on his airplane to that account."
The present controversy had its origins in 1986, when Ford proposed starting an avionics shop at the Huntsville-Madison County Airport. After initial negotiations to lease a hangar directly from the Airport Authority were unsuccessful, Ford began discussing with the officers of Huntsville Aviation the possibility of subleasing space in Huntsville Aviation's hangar. On March 24, 1986, Ford and Gary Fuller, who was to be the primary avionics technician at the proposed shop, sent Whatley a letter on stationery with a typed "Aviation Services, Inc.," letterhead. The letter included the following:
"Dear Bill:
 "This letter will serve as our proposal to sublease space in Huntsville Aviation's hangar for the purpose of operating an Avionics Sales and Service Center.
 "We propose to rent hangar space from you and to add leasehold improvements to operate the sales and service center. I have attached a drawing of the addition which we would propose to make. We would propose to pay for the addition and to rent the hangar space from you on the following terms:
 "Lease Start Date: July 1, 1986 (construction of the improvements to start immediately upon execution of the lease).
 "Lease Term: 5 years or to the term of Huntsville Aviation's lease including all renewal terms.
"Rental Rate: $500.00 per month.
 "Lessee: Aviation Services, Inc., an Alabama Corporation wholly owned by Thomas S. Ford. *Page 1283 
 "Guarantors: Thomas S. Ford will personally guarantee the first year's rent.
". . . .
 "I have attached a copy of our statement of purpose which has been put together by Gary Fuller. Gary will be Vice President and General Manager of Aviation Services, Inc. I have also attached a copy of Gary's resume showing the experience that he has had in avionics and electronics. I will provide the financial backing for the project personally or through other partners. I have attached a copy of my personal financial statement. In the event that you need to check on our banking relations you may call Mr. Dean O'Ferrell or Mr. Bill Morrow with SouthTrust Bank.
 "I have also attached a copy of the list of equipment which we intend to purchase for the center. All of the items on this list have been located and we have been guaranteed delivery by May 1, which would give us adequate time to install the equipment by the start of the lease date.
". . . .
"Sincerely,
"s/Thomas S. Ford
"Thomas S. Ford
"President
"s/Gary W. Fuller
"Gary W. Fuller
"Vice President"
(Emphasis added.) The attached financial statement showed the net worth of Ford and his wife to be $1,716,757, including ownership of 1000 shares of Madison Investment valued at $994,676.
Without a written lease other than as exhibited by the above-quoted letter, Aviation Services began subleasing from Huntsville Aviation office space for the avionics shop and hangar space for its airplane. The rent of $500 per month for the office space and $750 per month for the hangar space was paid regularly.
Negotiations continued among the officers of Huntsville Aviation, officers of the Airport Authority, and Ford and Fuller about the proposed addition to Huntsville Aviation's building for the avionics shop. On June 24, 1987, Richard Tucker, acting executive director of the Airport Authority, sent a letter to Ford in his capacity as president of Madison Investment:
 "Re: Fixed Base Facilities Improvements Avionics Shop Addition
"Dear Tom:
 "This confirms our meeting yesterday with Mr. Tom Joyce [the architect] and Mr. Gary Fuller, wherein we reached the following agreement in an effort to move the stated project to completion:
". . . .
 "Rent structure will be $1000.00 per month to the Airport Authority (through Huntsville Aviation) based on $85,000.00 total project cost. . . . In the event total project costs exceed $85,000.00, the $1000.00 per month rent will be increased proportionally.
". . . .
 "Please acknowledge your concurrence with the agreement as set forth above in the space provided below in order that we can proceed with necessary revisions and advertisements for bids scheduled to be received July 21, 1987."
(Emphasis added.) At the end of the letter, under the word "ACCEPTANCE," was a blank space for Ford's signature as president of Madison Investment. He signed and dated the letter on June 29, 1987, and the Airport Authority received the accepted copy on June 30.
On September 8, 1987, Huntsville Aviation[3] and the Airport Authority executed the following addendum to their lease:
 "WHEREAS, HUNTSVILLE-MADISON COUNTY AIRPORT AUTHORITY, *Page 1284 
hereinafter referred to as 'Authority,' and MONTGOMERY AVIATION CORPORATION, hereinafter referred to as 'Company,' are presently related by the herein lease, its terms and conditions, and
 "WHEREAS, Company is desirous of operating or subletting a regional Avionic sales and service center on the premises the subject of said lease, and
 "WHEREAS, all the parties are desirous of providing a building for the operation of said sales and service center.
 "NOW, THEREFORE, the herein lease is amended as follows:
 "Authority shall construct a facility on the property presently leased to Company as per the attached plans and specifications which said building and improvements shall become a part of the leased property under the same terms and conditions as set out in the hereto original lease and Company shall pay to Authority $1,273. 19 per month additional rent [based on increased expected cost of the building] to begin on the next ensuing rent payment date subsequent to the completion of said building.
 "The said sales and service center is anticipated to be sublet. The subletting shall require approval of Authority as set out in the original lease.
 "Notwithstanding the foregoing, this agreement does not, nor shall it be construed to, obligate Company to establish or operate an Avionics sales and service center in the facility to be constructed by Authority. This agreement does, however, obligate Company to pay the additional rent referred to hereinabove regardless of whether the facility is or is not utilized as an Avionics sales and service center."
(Emphasis in original.)
Construction commenced on the avionics shop addition and was completed in time for the avionics shop to move in by January 1988. Under the formula, accepted by Ford as president of Madison Investment, for establishing the amount of rent according to actual cost of the building, Huntsville Aviation's lease addendum was amended to increase the additional rent to $1,334.60, effective January 1, 1988.
On April 11, 1988, Ford, as president of Aviation Services, wrote the Airport Authority, requesting it to "consider rescheduling the lease payments" because Aviation Services was operating at a loss and needed time to establish its business. The financial statement attached to that letter contained the following:
 "The Corporation has entered into a lease with Huntsville Aviation, Inc. for a 1400 sq. ft. (approx.) office and maintenance facility, hangar space, tie down slots and parking lot. The lease is for a period [of] 8 years at monthly payments of $1,356.00 [sic] for the building and $750.00 for the hangar space, tie down slots and parking lot."
The Airport Authority responded by saying that its lease was with Huntsville Aviation and that Ford would have to request relief from Huntsville Aviation.
About June 1988, Aviation Services began falling behind in its payments to Huntsville Aviation. Whatley stated in his deposition that, at that time, Ford repeatedly reassured him that he would pay the rent. For example, the deposition includes the following excerpt:
 "A. I remember one of the conversations we had along toward the — I'd say toward the end. . . . But Tom [Ford] came into my office, and I called Dave Goodwin, our assistant manager, into my office, and I wanted him to be there, because I was putting a lot of pressure on Tom to bring his account up to date. And Tom told me then that, 'I would be personally responsible for this, and I will see that you get paid.'
 "Q. And how many times had he said that prior to that time?
 "A. I can't tell you the number, but it was more than one.
"Q. And what was your response?
 "A. We wouldn't let him stay there if I hadn't believed him.
 "Q. The first time that he told you that, as you say, he would be personally responsible — and did he use those words, *Page 1285 
'I will be personally responsible for these debts; I will guarantee these debts'?
 "A. I can't say that those were the exact words that he used, but that's what I understood.
 "Q. Was there a possibility that you misunderstood?
"A. Negative."
Goodwin confirmed, saying "I can remember at least twice Mr. Ford assuring Mr. Whatley that the rent would be paid, that he would guarantee him that the rent would be paid."
In September 1988, Ford met with Robert P. Hudgens, the president of Huntsville Aviation; William T. Hudgens, the secretary of Huntsville Aviation; and Goodwin. Goodwin stated in deposition that Ford "again assured the Hudgenses, much in the same way that he had assured Mr. Whatley in the two previous meetings in his offices, that, you know, he was committed to this thing and that he was going to pay the bills." Robert Hudgens stated that "the thing that I remember most is that Tom said he was going to see that we got paid." William Hudgens's deposition included the following:
 "At this meeting, he laid out that Aviation Services was just not doing well. And we already knew that, because I think at this point he had already gotten to where he wasn't paying rent anymore. And by 'rent,' I mean the 750 for some of the hangar and tie-down and parking area, and then the 13 hundred and some-odd dollars that was supposed to pass through us to the Airport Authority for the new building. And he asked my father to give him some relief, and I can remember my father saying, 'Well, you have already taken relief. You are not paying.' And we worked out at that point taking this tug of his on and giving him credit for that tug. And I recall that I got right frustrated at that meeting and ended up walking around outside and coming back. Either before I left or after I got back, he did make the statement: 'I am going to pay you what I owe you.'
 "Q. And that was referring in the past tense, as to what was owed?
 "A. Well, when he said, 'I am going to pay you what I owe you,' I took it to mean that he was going to pay what he had committed to pay, and in my mind, he had committed to pay for the building and the rent from us for the term of this project, the 10-year amortization. That's what — when he started this thing, he knew that's what he owed, and as it went along that is what he knew he owed.
 "Q. You are reflecting on what he knew he owed — you just got that from conversations that you had with Mr. Whatley or with your father?
 "A. Yes, and then at some point during all this, I would see copies of letters floating around, back and forth, and documents back and forth, between the Airport Authority and Tom Ford and us and Aviation Services, and I think there has even been one on Madison Investment letterhead. But in one of those documents he did lay out that he was going to be personally responsible or back this project. And that's where I have been coming from all this time. There was not any question in our mind that he had personally committed to back this thing up.
 "Q. And that letter would have been a letter to Huntsville Aviation or to the Airport Authority?
"A. I don't recall who the letter was to.
 "Q. Do you recall that that letter put any limitations or stipulations upon Tom Ford's personal involvement?
 "A. I do recall that he mentioned rent, and he mentioned a one-year personal guarantee on some rent. And I recall that elsewhere in the letter he talked about the project, and — I would have to see the document again to get more specific, but I am under the impression right now, from memory, that the project related to the building rather than renting space or renting land or renting an area. *Page 1286 
 "Q. But that is an interpretation that you have put on it or — how did you arrive at that interpretation?
 "A. From the way the letter was written, it looked to me like that's what it said, that he was going to personally stand for — and I think the word that was used was the 'project.' I think that would be the building."
William Hudgens was shown a copy of the March 24, 1986, letter quoted at the beginning of this opinion and was asked if it was the letter he recalled. He answered that it was, and his deposition continued:
 "Q. Now it says over here what he personally guarantees, does it not, on the first page?
 "A. . . . [I]n my mind, he was proposing to rent space, and then he says, 'to add leasehold improvements.' And he says here, 'We would propose to pay for the addition, and to rent.' So in my mind, the addition is the project, and rent is some hangars and maybe the ground rent and things like that. But in our mind it was — you know, we realize there is an issue — there is this building that somebody is going to stick up there, and — We didn't want it; we didn't need it. So that's how we were interpreting this.
 "Q. But you didn't have any discussions with Mr. Ford about that letter?
"A. No, sir.
 "Q. And an equally valid interpretation of that clause would be that he was going to provide capitalization for Aviation Services; is that correct?
". . . .
 "A. Well, I am not enough of a legal mind or a judge or jury to determine that. That's not how I interpreted it, but what I interpreted may or may not matter."
In reference to Huntsville Aviation's execution of the addendum to its lease, William Hudgens stated:
 "We did sign this document that did obligate us to make those payments. And the reason we did that was Tom Ford had personally said, 'I am going to do this.' So we didn't feel that we were at risk, is the truth of the matter. We felt like we were being the conduit, and we signed what we said we would sign, and then we turned it over to him, and he started not signing."
Huntsville Aviation filed this action on February 7, 1989, originally stating only two causes of action, one for breach of the agreement "to pay rent on the newly constructed addition for the term of Plaintiff's lease, including all renewal terms, or ten years, whichever is less," and the other as third-party beneficiary of the letter agreement between Madison Investment and the Airport Authority.
Ford's deposition was taken on April 24, 1989, and he denied having made any statements indicating that he would personally guarantee payment for the addition or that he was "good for the payment of that rent." Thereafter, on May 17, 1989, Huntsville Aviation amended its complaint, adding a count seeking the value of the defendants' use and occupation of the premises since they stopped paying rent in June 1988, and a count alleging fraud, as follows:
 "27. In the Fall of 1988, Defendant Ford represented to agents of the Plaintiff that he would be personally liable for the rent due under the lease agreement as hereinabove described, and relying on said representations the Plaintiff continued to allow the Defendants to occupy the avionics shop and hangar space.
 "28. Defendant Ford knew or should have known the Plaintiff would rely upon said representations in allowing the Defendants to continue occupying the avionics shop and hangar space.
 "29. Said representations were false and were made intentionally and with knowledge of their falsity."
On June 23, 1989, Huntsville Aviation filed an unlawful detainer action and, pursuant thereto, Aviation Services was evicted from the premises. Discovery continued in this action, and the trial court later entered the summary judgment at issue.
Summary judgment should be entered only if the materials submitted in *Page 1287 
support of, and those in opposition to, the motion for summary judgment "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Ala.R.Civ.P.
In order to determine whether Huntsville Aviation's claims based on breach of the lease and on unlawful use and occupation of the premises will lie against Ford or Madison Investment, we turn to the law with respect to the disregarding of separate corporate existence.
Ordinarily, a corporation's separate existence will be recognized so that liability for the corporation's debts will be limited to the corporate assets. Co-Ex Plastics, Inc. v.AlaPak, Inc., 536 So.2d 37 (Ala. 1988); Cohen v. Williams,294 Ala. 417, 318 So.2d 279 (1975). On the other hand, "the legal fiction of separate corporate entity should not be so extended 'as to enable the corporation to become a vehicle to evade just responsibility.' " Kwik Set Components, Inc. v. DavidsonIndustries, Inc., 411 So.2d 134, 136 (Ala. 1982), quoting ForestHill Corp. v. Latter Blum, Inc., 249 Ala. 23, 27,29 So.2d 298, 300 (1947).
 "A separate corporate existence will not be recognized when a corporation is so organized and controlled and its business so conducted as to make it a mere instrumentality of another or the alter ego of the person owning and controlling it. . . . A corporation and the individual or individuals owning all its stock and assets can be treated as identical, even in the absence of fraud, to prevent injustice or inequitable consequences."
Barrett v. Odom, May DeBuys, 453 So.2d 729, 732 (Ala. 1984), citing Woods v. Commercial Contractors, Inc., 384 So.2d 1076
(Ala. 1980), and Cohen v. Williams, supra.
The evidence set out above shows that a fact question was presented on the question of whether Ford so conducted the business of Aviation Services as to be the alter ego of the corporation. The statement in the March 24, 1986, letter that "I will provide the financial backing for the project personally or through other partners" might suffice on its own to make Ford personally liable for the payments necessary to amortize the cost of the building addition.[4] It is especially significant in light of the deposition testimony of William Hudgens that the letter conveyed to him a distinction between "rent," such as for Huntsville Aviation's existing hangar space or the office space to be used until the addition was completed, and "the project," which he took (and which reasonably could be taken) to mean the addition to the building.
In addition to that letter, the evidence indicated that Ford acted as the alter ego of Aviation Services and used his corporations interchangeably. Setting aside for the moment the question of fraud, we note that the deposition testimony of the Huntsville Aviation employees that Ford repeatedly assured them that he would be responsible for the debts of Aviation Services presents a jury question on the "breach of lease" and "use and occupation" claims as against Ford. Ford raised a defense of the Statute of Frauds, Ala. Code 1975, § 8-9-2, asserting that the alleged promise was a promise to pay the debt of another. That defense can be answered by two points: one, the March 24, 1986, letter did provide written evidence of the promise, and two, if the jury were to accept the evidence that Aviation Services was merely Ford's alter ego, the promise would be to pay his own debt, not that of another.
On November 10, 1988, after the meeting described above, Ford wrote a letter on Madison Investment stationery to Robert Hudgens, stating that he was considering whether to put more money into Aviation Services or to close the shop, and he signed the letter simply as "president." This is susceptible to the interpretation that Ford was holding himself out as transacting the *Page 1288 
business at hand with Huntsville Aviation in his capacity as president of Madison Investment.
There was also evidence that, in obtaining credit from suppliers of equipment for the avionics shop, Ford used Madison Investment's credit to secure the goods and referred to Aviation Services as a "captive leasing company of Madison Investment." Gary Fuller executed the following affidavit:
 "I worked with Tom Ford and Aviation Services, Inc., during 1987 and through May of 1988. During the time that I worked with Tom Ford and Aviation Services, Inc., Tom Ford was the sole stockholder of Aviation Services, Inc., and exercised complete control over the corporation.
 "During the time that I worked for Tom Ford and Aviation Services, Inc., money was transferred from another corporation owned by Tom Ford, Madison Investment Co., Inc., to pay bills. To my knowledge, no notes or other instruments were signed for said transfers. In addition, in order to obtain credit, letters similar to the letter attached hereto as Exhibit 'A' were sent to creditors."
The exhibit "A" mentioned in the affidavit was a letter to a supplier requesting credit for Aviation Services based on Madison Investment's financial statement and credit rating.
For the foregoing reasons, Huntsville Aviation's claims against Ford and Madison Investment based on breach of the lease and seeking the value of the use and occupation of the premises should have withstood the summary judgment motions.
Huntsville Aviation should also be allowed to proceed with its claim against Madison Investment as a third-party beneficiary to the agreement between Madison Investment and the Airport Authority.
 "[O]ne for whose benefit a valid contract is made, although he is not a party to the contract and does not furnish the consideration therefor, may maintain an action on the contract against the promisor."
Mutual Benefit Health Acc. Ass'n of Omaha v. Bullard,270 Ala. 558, 563, 120 So.2d 714, 719 (1960).
 "To recover under a third-party beneficiary theory, the complainant must show: 1) that the contracting parties intended, at the time the contract was created, to bestow a direct benefit upon a third party; 2) that the complainant was the intended beneficiary of the contract; and 3) that the contract was breached."
Sheetz, Aiken Aiken, Inc. v. Spann, Hall, Ritchie, Inc.,512 So.2d 99, 101-02 (Ala. 1987) (citations omitted); Collins Co. v.City of Decatur, 533 So.2d 1127 (Ala. 1988).
Madison Investment contends that its contract was not made for the benefit of Huntsville Aviation. However, Huntsville Aviation's increased liability in its lease addendum was based on Madison Investment's contract with the Airport Authority. Later, the amendment to the addendum further increased the rent based expressly on Madison Investment's agreement that the amortization rent would increase proportionally to increases in the cost of the building. Although the contract between Madison Investment and the Airport Authority did not expressly refer to Huntsville Aviation's increased rent obligation, that agreement did lead directly to Huntsville Aviation's becoming obligated to pay for a building that it did not propose to use and for which Madison Investment had contracted. The heading of the agreement stated that it regarded "Fixed Base Facilities Improvements/Avionics Shop Addition." A jury could find, therefore, that it was within the contemplation of the parties that Huntsville Aviation would have primary responsibility for improvements to its facilities and that, by agreeing to make payments "through" Huntsville Aviation, Madison Investment was conferring a direct benefit on Huntsville Aviation. Madison Investment's promise to make the payments "through Huntsville Aviation" could clearly be found to have been made for Huntsville Aviation's benefit, that is, to relieve it of the obligation that it was undertaking for Madison Investment's sake. Thus, the trial court erred in entering summary judgment on this claim. *Page 1289 
Finally, Huntsville Aviation argues that the trial court erred in entering summary judgment for Ford on the fraud claim. The alleged fraud involved a promise to perform an act in the future. Therefore, it involved, in addition to the usual elements of reliance on a fraudulent misrepresentation to the plaintiff's detriment, the elements that the promise was made with an intent not to perform the act promised and with an intent to deceive the plaintiff. Porter v. Hook, 554 So.2d 382
(Ala. 1989). The allegation is that Ford assured Huntsville Aviation's officers in the fall of 1988 that he would pay "what he owed." Huntsville Aviation alleges that Ford thereby promised to be personally liable for the amortization payments on the building addition, that he had no intention of making any such payments out of his personal funds, and that he thereby intended to deceive Huntsville Aviation into allowing the avionics shop to remain on the premises.
The materials submitted would support a finding that Ford intentionally implied that he personally would pay the amount owed on the building, or that he would continue to put money into Aviation Services, or that funds in Madison Investment would be used to support the avionics shop. A jury could also find that, while making such promises, Ford intended to make payments only out of funds already at Aviation Services' disposal or funds generated by the business. Thus, a fact question was presented as to whether Ford intended not to perform the promised acts, but rather to deceive Huntsville Aviation into believing that continuance of the avionics shop would be backed by his personal net worth or by the net worth of Madison Investment. Thus, the trial court erred in entering summary judgment on the fraud claim.
For the foregoing reasons, the judgment is reversed and the cause is remanded.
REVERSED AND REMANDED.
HORNSBY, C.J., and ADAMS, KENNEDY and INGRAM, JJ., concur.
[1] Pursuant to Rule 54(b), Ala.R.Civ.P., the trial court made the summary judgment for Ford and Madison Investment final.
[2] A fixed-base operator is "an individual or firm operating at an airport and providing general aircraft services such as maintenance, storage, ground and flight instructions, etc."Aviation/Space Dictionary, E.J. Gentle, ed. (6th ed. 1980). SeeEpps Aircraft, Inc. v. Montgomery Airport Authority,570 So.2d 625 (Ala. 1990).
[3] As can be seen, the addendum was actually executed by Montgomery Aviation Corporation, which owns all the stock of Huntsville Aviation. Huntsville Aviation was incorporated after Montgomery Aviation entered into the lease. In 1981, Huntsville Aviation was given all rights held by Montgomery Aviation under the lease, although Montgomery Aviation was still bound by its obligations thereunder. Therefore, for simplicity, we shall refer to Huntsville Aviation as the lessee under the addendum.
[4] Of course, Ford contends that he intended to provide financial backing only in the capitalization of Aviation Services and the purchase of the equipment mentioned in the letter. The letter is not necessarily subject to that interpretation, however, so Ford's contentions do not support the summary judgment.