This case presents three questions certified from the Eleventh Circuit Court of Appeals, 755 F.2d 1404, concerning Alabama's laws regulating the insurance business. The questions are:
(1) Insurance is written in the State of Alabama for an out-of-state insurance company pursuant to a contract between its general agent and an Alabama corporation doing business as an insurance agency. Because Alabama Code 1975, § 27-7-1 (a), requires agents and brokers to be natural persons, the corporation does business under the authority of a license issued to its sole stockholder, officer, and director. Alabama Code 1975, § 27-7-36, states that all premiums belonging to others received by an agent or broker in transactions under his license shall be trust funds. Does the out-of-state company's claim that these two statutes entitle it to a return of premiums or to damages for loss or conversion of premiums state a cause of action against the individual licensee?
(2) Does the arrangement described in the first certified question establish as a matter of law that a cause of action is stated against the individual on the theory of piercing the corporate veil?
(3) If a cause of action is not stated as a matter of law against the individual on the piercing of the veil theory, is the existence of the described arrangement a factual element to be considered in determining whether the corporate veil should be pierced? *Page 1363 
Gene Rabun is the sole shareholder and employee of the Gene Rabun Insurance Agency, Inc. (GRIA), an Alabama corporation. In the fall of 1980, GRIA signed an agreement with Essex Insurance Brokers, Inc., a California corporation, to sell Amherst Insurance Company policies in Alabama for Essex. Essex is the national general agent for Amherst. Essex had the authority and responsibility to manage and service all agreements, approve all applications of insureds, issue binders and policies, adjust claims, and receive premiums for Amherst.
In December 1981, Essex solicited GRIA to be the local agent for Kenilworth Insurance Company policies in Alabama. Kenilworth, an Illinois corporation, also authorized Essex to act as its national general agent. GRIA signed an agreement to sell Kenilworth policies in Alabama for Essex.
On April 21, 1982, GRIA learned that the state of Illinois had declared Kenilworth insolvent and ordered it liquidated. Essex informed GRIA that it was cancelling all Kenilworth policies and returning to GRIA the premiums it had not paid to Kenilworth. Essex suggested that Kenilworth policies be switched to coverage by Amherst to protect Kenilworth policyholders whose coverage lapsed because of Kenilworth's collapse. GRIA rewrote most of the Kenilworth policies to provide for coverage by Amherst.
James W. Schact, then Director of Insurance for Illinois and liquidator of Kenilworth, brought suit against Gene Rabun individually on April 23, 1983, in the United States District Court for the Northern District of Alabama. That court granted Rabun's motion for summary judgment, finding that the facts stated no cause of action against Rabun as an individual. The court granted Schact leave to amend his complaint to assert a claim against GRIA. Instead, Schact appealed the decision to the Eleventh Circuit Court of Appeals. John E. Washburn succeeded Schact as Director of Insurance for Illinois and was substituted for Schact on February 9, 1984. The Alabama Independent Agents Association filed an amicus curiae brief supporting appellee on September 17, 1985.
 QUESTION ONE
Washburn contends that Gene Rabun had a fiduciary responsibility to hold the premiums paid on Kenilworth policies in trust for Kenilworth's benefit. Washburn argues that this result is mandated by reading Code 1975, § 27-7-36, in conjunction with § 27-7-1. Section 27-7-36 provides:
 "(a) All premiums, return premiums or other funds belonging to others received by an agent, broker or solicitor in transactions under his license shall be trust funds so received by the licensee in a fiduciary capacity, and the licensee in the applicable regular course of business shall account for and pay the same to the insurer, insured, agent, broker or other person entitled thereto.
 "(b) Any agent, broker or solicitor who, not being lawfully entitled thereto, diverts or appropriates such funds, or any portion thereof, to his own use shall, upon conviction, be guilty of embezzlement and shall be punished as provided by law as if he had stolen such funds."
Section 27-7-1 provides, in pertinent part:
 "(a) For the purposes of this chapter, the following terms shall have the meanings respectively ascribed to them by this section:
 "(1) AGENT. A natural person appointed by an insurer to solicit and negotiate insurance contracts on its behalf, and if authorized to do so by the insurer, to effectuate, issue and countersign such contracts. An agent may not delegate the countersignature authority by appointing another individual as his attorney-in-fact.
 "(2) BROKER. A natural person who, on behalf of the insured, for compensation *Page 1364 
as an independent contractor, for commission or fee and not being an agent of the insurer, solicits, negotiates or procures insurance or the renewal or continuance thereof, or in any manner aids therein, for insureds or prospective insureds other than himself. Brokers cannot bind the insurer and all business produced must be countersigned by a resident agent of the insurer accepting the risk."
The legislative purpose for requiring insurance agents and brokers to be natural persons, Washburn contends, was to insure individual responsibility for the actions of the agency rather than allowing corporate responsibility. Washburn argues that in the absence of a specific contractual provision to the contrary, Rabun, as an individual, is responsible for holding the paid premiums in trust for Kenilworth. Washburn points out that other jurisdictions, interpreting similar provisions, have held insurance agents, as individuals, to such a fiduciary standard. Rabun counters with the argument that in each of those cases the facts are distinguishable from the facts present here. We agree with Rabun.
The case Washburn relies on most heavily to support his argument is Middlesex Insurance Co. v. Mann, 124 Cal.App.3d 558,177 Cal.Rptr. 495 (1981). There, Middlesex was an insurance company doing business in California through Commercial National Security Service, Inc. (CNSS), its managing agent. CNSS entered into an agency agreement with Multiple Insurance Service (Multiple), a local agent, which was owned and operated by Mann. This agreement between CNSS and Multiple was described by the court as follows:
 "Multiple agreed to sell insurance policies issued by Middlesex, to collect all premiums on the policies it sold, to deduct commissions from the gross premiums and to remit the balance to CNSS. Multiple was not required to remit the balance of premiums until 45 to 60 days after collection. In the interim, commonly referred to as `the float,' Multiple would deposit the premium payments it received into a trust account and thereafter pay to Middlesex the amounts due it and transfer sums from the amounts due as commissions into its operating account."
124 Cal.App.3d at 561, 177 Cal.Rptr. at 497.
Under this arrangement, it is clear that premiums collected by Multiple "belonged" to its principal, and that collected premiums were to be held in trust in a separate trust account. Likewise, if Multiple was unable to collect outstanding premiums, such amounts could not be, and were not, held in trust, and Multiple owed no further duty of payment to either Middlesex or CNSS.
The evidence indicated that certain premiums were collected by Multiple and that Mann failed to hold the payments in trust as required by the agency agreement. Middlesex brought suit against Mann under Cal.Ins. Code § 1733, which is very similar to Code 1975, § 27-7-36, and under Cal.Ins. Code § 1734, which provides in part that all premiums received by the licensee not remitted "by him to the insurer or the person entitled thereto within fifteen (15) days after the receipt `must be deposited' in a trustee bank account or depository separate from any other account or depository . . . for the account of [the persons entitled thereto]." 124 Cal.App.3d at 569, 177 Cal.Rptr. at 502. Thus, it is obvious from both the terms of the agency agreement and the relevant statutory provisions that Mann and his agency held collected premiums in trust for the insurer and that Mann's fiduciary responsibility as trustee of those proceeds fit squarely within the requirements of §§ 1733 and 1734.
Here, though, there is no statutory, or even contractual, requirement that Rabun deposit premiums on Kenilworth policies in a separate bank account. Instead, § 27-7-36 (a) requires the agent to account for the premiums and to pay them, in theregular course of business, to the person entitled to them. Rabun's contract with Essex provided: *Page 1365 
 "(2) Agent [GRIA] shall be primarily liable to Underwriting Manager [Essex] for the full amount of premium, less commission and applicable state taxes, including additional premiums on every insurance contract placed for Agent. Such premiums shall be due and payable by the Agent to Underwriting Manager as set forth in Addendum Number One of this contract."
Thus, the person entitled to receive the funds from Rabun was Essex. Nowhere in this contract is any mention made of Kenilworth, or of an obligation upon Rabun or his agency to remit funds to Kenilworth or to any other insurer. In fact, the contract provides that Essex was to "exert its best effort to place with an insurer, or insurers, such risks as it may be called upon by Agent to place." In other words, Rabun did not, under the contract, or in the regular conduct of business, have any contact whatsoever with Kenilworth. A second contract between Kenilworth and Essex provided that it was the duty of Essex to "[c]ollect premiums on all policies and deposit them in a trust account for" Kenilworth. Thus, Essex had the duty, under this contract and under § 27-7-36 (a), to remit to Kenilworth premiums it received from Rabun.
Similarly, the other cases cited by Washburn are distinguishable from the present action.
In both Robertson v. Malone, 190 F.2d 756 (5th Cir. 1951), and Shoup v. Mayerson, 454 P.2d 666 (Okla. 1969), unlike this case, there was a contract directly between the insurer and the agent expressly providing that the agent was to hold the funds in trust for the insurer. In Charles W. Virgin InsuranceAgency, Inc. v. Alabama General Insurance Co., 114 So.2d 524
(Fla.Dist.Ct.App. 1959), the court held, in the insurer's receivership proceeding, that an agent was not entitled to an offset against premiums owed to the insurer for indebtedness owed by the insurer to the agent. Alabama law is different. Code 1975, § 27-32-39, provides that in a receivership proceeding filed in this state by a foreign insurer, the agent is entitled to offset against premiums he has collected any debts owed him by the insurer, with the balance to be paid to the foreign insurer. More importantly, although the opinion is unclear on this point, it appears that the agreement in CharlesW. Virgin Insurance was between the insurer and the agent directly, whereas here Essex was the middleman between Kenilworth and Rabun. Rabun had no direct dealings with Kenilworth.
Washburn next contends that although there are two agreements involved here, Rabun's agreement with Essex does not specifically state that the premiums are not to be held in trust, and therefore, that under § 27-7-36 (a) Rabun must hold the premiums in trust for Kenilworth. This argument assumes that if the funds are held in trust, they must be held in trust for the insurer, Kenilworth. Section 27-7-36 (a) states that the funds must be held in trust for the person entitled thereto. Under the contract, however, Rabun was under no duty to hold the funds in trust.
Therefore, the first question must be answered in the negative.
 QUESTIONS TWO AND THREE
We feel that these two questions are sufficiently related to warrant discussing them together.
Washburn contends that because Rabun was the sole shareholder and employee of the Gene Rabun Insurance Agency, Inc., and he directed all its business, the corporation was merely his alter ego and he should be held responsible for all actions that he took in the name of the corporation.
The general rule regarding the separation of the corporate entity from the shareholders was stated as follows in Barrettv. Odom, May DeBuys, 453 So.2d 729, 732 (Ala. 1984):
 "We generally accept the concept that a corporation is a separate legal entity, *Page 1366 
but when this concept is invoked in support of an end subversive of justice, it will be disregarded. Cohen v. Williams, 294 Ala. 417, 420, 318 So.2d 279, 280
(1975) (quoting 18 Am.Jur.2d Corporations § 14 at 559 (2d ed. 1965)). A separate corporate existence will not be recognized when a corporation is so organized and controlled and its business so conducted as to make it a mere instrumentality of another or the alter ego of the person owning and controlling it. Woods v. Commercial Contractors, Inc. 384 So.2d 1076, 1979 (Ala. 1980). A corporation and the individual or individuals owning all its stock and assets can be treated as identical, even in the absence of fraud, to prevent injustice or inequitable consequences. Cohen, 294 Ala. at 421, 318 So.2d at 281."
However, as the Court of Civil Appeals stated in Read NewsAgency, Inc. v. Moman, 383 So.2d 840, 844, cert. denied,383 So.2d 847 (Ala.Civ.App. 1980):
 "[I]n order to justify `piercing the veil' of corporate existence, it is not enough to show that the corporation may have been controlled by one or a few persons. Goldmann v. Johanna Farms, Inc., 26 N.J. Super. 550, 98 A.2d 142 (1953). . . . [A]s a matter of general corporate law our decisions hold that he who seeks to have the corporate cloak set aside must either demonstrate fraud or show that the recognition of the corporate form will result in injustice or inequitable consequences. Cohen v. Williams, [294 Ala. 417, 318 So.2d 279 (1975)]; C.E. Development Co. v. Kitchens, 288 Ala. 660, 264 So.2d 510 (1972)."
Clearly, then, even though a corporation is controlled by only one person, who is also the sole shareholder, in the absence of fraud or inequity, he will be protected from individual liability by the corporate entity.
Washburn has shown no evidence that Rabun set up the corporation as a subterfuge to defraud creditors. Nor are there any facts suggesting that Rabun treated the corporation as an alter ego or otherwise failed to observe and comply with the legal requirements of Alabama corporate law. Rather, the undisputed facts developed on the motion for summary judgment established that (1) GRIA at all times since 1975, has been an operating corporation; (2) GRIA was an agent of Essex in Alabama pursuant to a written agreement; (3) at all times GRIA held itself out to the public as a corporation; (4) GRIA maintained proper corporate records; and (5) GRIA used corporate bank accounts and issued corporate checks to satisfy its corporate obligations.
The underlying premise of appellant's argument in his brief, however, is that stockholders of a closely held corporate insurance agency are personally liable for corporate debts owed to its principal, the insurer. This premise has no basis in Alabama law, insofar as we can tell. It is a fundamental public policy of this state that owners of an insurance agency have the right to incorporate. An insurance company which contracts to do business with a properly incorporated insurance agency must look to the corporate entity to recover premiums allegedly owed by the agency, absent some personal guarantee of the obligations of the corporation by the stockholders.
Therefore, the second certified question must be answered in the negative as well. The arrangement presented, where the sole shareholder controls the corporation, does not state a cause of action against Rabun as a matter of law. We are also of the opinion that the third certified question, based on the law presented above, must be answered in the negative as well. The evidence in the record clearly establishes that Rabun operated GRIA as a separate entity at all times. As stated above, Alabama law permits a corporation to be organized and operated by one shareholder. Therefore, Rabun is shielded from liability on the debts of GRIA. *Page 1367 
Thus, the answer to all three certified questions is in the negative.
CERTIFIED QUESTIONS ANSWERED.
TORBERT, C.J., and JONES, SHORES, BEATTY, ADAMS and HOUSTON, JJ., concur.