182 B.R. 887 (1995)
In re COALA, INC., Debtor.
AUREUS INTERNATIONAL, INC. and Omni, Inc., Plaintiffs,
v.
COALA, INC., Defendant.
Bankruptcy No. 93-82327-EDB-7. Adv. No. 93-80161.
United States Bankruptcy Court, N.D. Alabama, Northern Division.
May 24, 1995.
*888 *889 *890 William L. Chenault, III, Chenault, Hammond and Hall, P.C., Decatur, AL, for plaintiffs.
Michael F. Terry, Moulton, AL, for Former Employees of Coala, Inc.
MEMORANDUM OPINION ON COMPLAINT TO DETERMINE DEBTOR'S INTEREST IN PROPERTY
BENJAMIN COHEN, Bankruptcy Judge.
This matter came before the Court for a pretrial conference on the Complaint to Determine Debtor's Interest in Property and to Compel Turnover of Property filed by Aureus International, Inc. and Omni, Inc. Mr. William L. Chenault, III, the attorney for the Plaintiffs; Mr. Michael F. Terry, the attorney for former employees of Coala, who oppose *891 the complaint; and Mr. Bob Rodgers, the Chapter 7 trustee, appeared at the hearing. The Defendant, Coala, Inc., was not represented and has made no response to the complaint or appearance in the case. Mr. Rodgers appeared at the hearing but did not oppose the complaint. The matter was submitted on a stipulation of facts filed jointly by the plaintiffs and the former employees, the record in the case and the arguments and briefs of counsel, who advised the Court that no testimony would be offered.[1]

I. FINDINGS OF FACTS
Frieda F. Hyles ("Hyles") is the president of Aureus International, Inc., ("Aureus") a Colorado corporation. Edward C. Nott ("Nott") is the president of another Colorado corporation, Omni, Inc. ("Omni"). Aureus and Omni each purchased a quantity of sewing machines and related sewing equipment from Walker and Reed Manufacturing Company of Moulton, Alabama, ("Walker and Reed") on December 18, 1992. Aureus and Omni both executed leases of their respective sewing machines and equipment to the Defendant, Coala, Inc., on January 2, 1993. As of that date, Coala, Inc. was not a legal entity, but on January 12, 1993, Hyles and Nott incorporated Coala, Inc. in Lawrence County, Alabama, and are the sole stockholders and officers of Coala, Inc. ("Coala").
The sewing machines and related equipment were subsequently delivered to Coala. Coala hired employees and proceeded to conduct a clothing manufacturing business. The sewing machines and related equipment leased from Aureus and Omni were used by the employees of Coala in the manufacturing operation.
Coala began to experience financial difficulties and on October 21, 1993, a petition for involuntary bankruptcy was filed against Coala by former employees who are owed wages. An order for relief under Chapter 7 of the Bankruptcy Code was entered against Coala on November 17, 1993, and a trustee was appointed.[2]

II. THE FORMER EMPLOYEES'S CONTENTIONS IN OPPOSITION TO THE COMPLAINT
Aureus and Omni filed the above adversary proceeding seeking the return of the sewing machines and other equipment that had been leased to Coala. The former employees of Coala oppose the return of the property. They contend that Coala is a mere sham corporation, that Hyles and Nott allowed Coala to generate debts while insulating assets from the claims of creditors by retaining the assets in the name of Aureus and Omni, and that the Court should therefore pierce the corporate veil and hold that the property is subject to the claims of Coala's creditors. In other words, the employees argue that because Hyles and Nott are the alter egos of Aureus, Omni, and Coala, that the assets of Hyles, Nott, Aureus and Omni should be subject to the claims of Coala's creditors. In an additional but secondary argument, the employees contend that Aureus and Omni cannot obtain the property because neither has obtained a certificate of authority to do business in the state of Alabama.
The employees contend that the following excerpts from or conclusions derived from the Joint Stipulation of Facts support their contentions: (a) Hyles and Nott are the officers of all three corporations; (b) no lease payments were made by Coala to either Aureus or Omni; (c) neither Aureus nor Omni attempted to recover the property, even though Coala was in default under the lease; (d) Coala did not provide evidence of insurance to Aureus and Omni as is required under the lease agreements; (e) neither Aureus nor Omni filed a UCC-1 statement covering the property; (f) Coala did not pay security deposits to Aureus and Omni; (g) neither Aureus nor Omni were authorized to do business in the state of Alabama during the time frames when the events outlined herein occurred; (h) neither Aureus nor Omni listed the property with the Lawrence *892 County tax assessor; and, (i) Coala had no assets at the time the property was leased.

III. CONCLUSIONS OF LAW

A. Piercing The Corporate Veil Theory

1. Stockholder Liability
The doctrine of piercing the corporate veil has historically been proposed by creditors of a corporation to impose personal liability on the corporation's stockholders, and to obtain satisfaction of the corporation's obligations from the stockholders' assets. In this case the former employees have not proved that the property is owned by the stockholders or anyone else other than Aureus and Omni. According to the stipulations of the parties, the property was purchased and paid for by Aureus and Omni from Walker and Reed. Coala has possession of the property only by virtue of leases from Aureus and Omni. Neither Aureus nor Omni owns stock in Coala. The "corporate veil" theory is useful only to impose liability on stockholders. Therefore, since the property is owned by Aureus and Omni, it cannot be reached by piercing Coala's corporate veil. If the former employees have grounds for piercing Coala's corporate veil, their remedy is by separate suit for money judgment against the stockholders of the corporation.
The shareholders of the debtor corporation, Hyles and Nott, are not parties to this proceeding and the former employees have not, to the Court's knowledge, filed suit in any other forum or obtained judgment against either Hyles or Nott based on the debts owed to the employees by Coala. The Court knows of no basis for condemning specific property for the payment of a money obligation which has not been reduced to judgment. Even if Hyles and Nott had been proved to be the owners of the property, the property cannot be subjected to the payment of the debts owed to the former employees until the employees obtain a money judgment against Hyles and Nott. Chapter 7 may not be used as a de facto prejudgment attachment simply because the assets of the non-debtor entity happen to be in the hands of the bankruptcy trustee, especially where no proceeding has been instituted where a judgment may be anticipated.

2. The Former Employees's Alter Ego Theory
The former employees's theory appears to be that:
1. Because Hyles and Nott are the alter egos of Aureus and Omni, then the sewing equipment actually belongs to Hyles and Nott;
2. Because Hyles and Nott are the alter egos of Coala, then any debt owed by Coala is the personal obligation of Hyles and Nott;
3. Therefore, since the debt owed to the former employees by Coala is a personal obligation of Hyles and Nott, then that debt may be satisfied from the personal assets of Hyles and Nott, including the sewing equipment.
The first part of the argument, that Hyles and Nott own the sewing machines, is based on sort of an "inverted alter ego" theory, that is, if the corporation is a sham and a mere instrumentality of the stockholders, then the property owned by the corporation is in fact that of the stockholders and subject to payment of their individual debts. In other words, rather than the typical alter ego theory that corporate obligations are to be satisfied from stockholder assets, the employees argue that stockholder obligations are to be satisfied from corporate assets, here the sewing machines of Aureus and Omni. There are at least three problems with this theory. First, the joint stipulation does not indicate the extent, if any, that either Hyles or Nott own stock in either Aureus or Omni. The Court is limited by the stipulated facts in deciding the issues between the parties and may not assume facts which may be essential to either party's cause of action or defense. Second, the former employees have cited no case which espouses or supports their "inverted alter ego" theory. While the corporate veil clearly may be pierced to subject the assets of individual stockholders to the payment of corporate obligations, the legal basis for subjecting the assets of the corporation to the satisfaction of the individual liabilities of the stockholders, *893 except by judgment against the individual stockholders and execution on the stock owned by them, is less than clear.[3] Third, others would be necessary parties to any action in which the assets of Aureus and Omni were being distributed. This would include other stockholders of Aureus and Omni, if any; other creditors of Aureus and Omni, who would be entitled to satisfaction from the corporate property first; and other creditors of the two individuals, who would be entitled to share in what was left after satisfaction of corporate creditors.
Even if Hyles and Nott owned all of the stock of Aureus and Omni, the former employees have not proved a basis for piercing Coala's corporate veil, or that Hyles and Nott were the alter egos of Aureus and Omni. A corporation is a distinct and separate entity from the individuals who compose it as stockholders or who manage it as directors or officers and a corporation's obligations and transactions are to be considered separately from those of the corporation's stockholders.[4] A corporation's separate existence is recognized so that liability for the *894 corporation's debts will be limited to the corporate assets and those who invest in and operate the corporation will be insulated from liability for the same debts.[5] An aggrieved party must first "pierce the corporate veil" before a shareholder's liability for an obligation of the corporation may be established.[6] Because the concept of limited liability is one of the principal purposes for which the law created the corporation, piercing the corporate veil is not a power that is lightly exercised.[7]
In order for a corporation to be accorded treatment as a separate legal entity, it must exist and function as such and not merely as the alter ego of a person owning and controlling it.[8] A separate corporate existence will not be recognized when a corporation is so organized and controlled and its business so conducted as to make it a mere instrumentality of another or the alter ego of the person owning and controlling it.[9]
For the separate corporate existence to be disregarded under the "instrumentality" rule, the control by the stockholders must amount to total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation.[10] "The dominant party must have complete control and domination of the subservient corporation's finances, policy and business practices so that at the time of the attacked transaction the subservient corporation had no separate mind, will, or existence of its own. . . ." First Health, Inc. v. Blanton, 585 So.2d 1331, 1334 (Ala.1991), quoting Messick v. Moring, 514 So.2d 892, 894-895 (Ala.1987).
Mere domination or control of a corporation by its stockholders is not however, enough to allow a piercing of the corporate veil. The stockholders must have misused that control and harm or loss must have resulted from it.[11] It is typical for the majority *895 stockholders to control the operation of a closely held corporation. The fact that majority stockholders control the business of the corporation does not make that corporation a sham.[12] The law, in fact, recognizes one-person corporations and accepts the fact of domination by one person.[13] Therefore, in order to justify piercing the veil of corporate existence, it is not enough to show that the corporation may have been controlled by one or a few persons.[14] In the absence of fraud or inequity, the shareholders will be protected from individual liability by the corporate entity, even though the corporation is controlled by the shareholders.[15] In order to pierce the corporate veil, the complaining party must show not only that the dominant party has complete control and domination of the subservient corporation's finances, policy, and business practices but also that it misused that control to his detriment.[16] If the stockholders dominated the subservient corporation, and were guilty of fraud in asserting the corporate existence, or if recognition of the corporate existence will result in injustice or inequitable consequences, the corporate veil may be pierced.[17] If the corporation has been organized solely by stockholders to avoid personal liability and used by the stockholders for their personal purpose, subversive to the rights of others, the corporate veil can be pierced to impose personal liability on the stockholders.[18]
The following factors are generally considered when determining whether the corporate form may be disregarded: (1) inadequacy of capital; (2) fraudulent purpose in conception or operation of the business; or (3) operation of the corporation as an instrumentality or alter ego.[19] The last mentioned factor, domination of the subservient corporation, is indicated "where a corporation is set up as a subterfuge, where shareholders do not observe the corporate form, where the legal requirements of corporate law are not complied with, where the corporation maintains no corporate records, where the corporation maintains no corporate bank account, where the corporation has no employees, where corporate and personal funds are intermingled *896 and corporate funds are used for personal purposes, or where an individual drains funds from the corporation." Backus v. Watson, 619 So.2d 1342, 1345 (Ala.1993), quoting Simmons v. Clark Equipment Credit Corp., 554 So.2d 398, 400-401 (Ala.1989). None of these factors are present in the instant case.

(a) Capitalization
The employees have not proved that either Omni, Aureus or Coala was undercapitalized. The bare statement that "Coala, Inc. did not have any assets when the equipment was bought," does not dispel the possibility that Coala subsequently received adequate financing to launch its manufacturing operation, or the possibility that the stockholders of Coala subsequently made capital contributions to the corporation to finance the operation, or the possibility that Coala acquired substantial assets after that date. Nothing in the stipulation indicates that Coala's financial demise was the result of undercapitalization.[20] In fact the stipulation contains no information regarding the capitalization of either Omni or Aureus.

(b) Fraud
The Court is sympathetic to the plight of the former employees. But this Court cannot discern from the stipulated facts any fraudulent purpose or scheme in the lease transaction between Aureus and Omni and Coala, or unjust or inequitable result that has inured to the former employees as a consequence of that transaction. The sewing equipment was purchased from funds of Aureus and Omni and not from funds of Coala that might have otherwise been available to pay the claims of the former employees. It was only logical and fair for Aureus and Omni to then retain their respective interests in the equipment, rather than giving it to Coala outright, and to expect to receive a profit from their investment in the equipment. It would ostensibly be no different if Coala had leased the equipment from some-one other than Aureus and Omni. Many companies lease their business equipment, furnishings and facilities. The former employees have not argued or proved that it was improvident from a business standpoint for Coala to lease the equipment from Aureus and Omni. The employees do not contend that the terms of the respective leases were unfavorable to Coala or that Coala did not stand to benefit from those leases. The simple fact that Aureus and Omni were related to Coala from the standpoint of having common officers is inconclusive.
Business dealings between related corporations are common and accepted when not fraudulent. The lease arrangement was beneficial to Coala. Coala paid nothing for the use of the equipment; a fact that would tend to facilitate the success of Coala's business and the continued employment of its employees. It cannot be assumed that Aureus and Omni or Hyles and Nott intended financial problems for Coala or anticipated receiving no income from the lease of equipment to Coala. Likewise, to the extent that Aureus and Omni exercised forbearance regarding the lease default by Coala, the former employees and Coala were the beneficiaries, and not Aureus and Omni or Hyles and Nott.

(c) Instrumentality
The employees have not proved that Hyles and Nott treated Omni, Aureus, and Coala as mere instrumentalities. The simple fact that Hyles and Nott owned all of the stock in Coala is insufficient.[21] In fact *897 there is nothing in the stipulation which indicates that corporate formalities were ignored.[22] One possibility is that each corporation had separate books, each maintained separate bank accounts, none of the funds of any of the corporations were intermingled with those of another and Hyles and Nott did not use the funds of any corporation to make personal expenditures.
The employees have not proved that Coala was dominated by either Hyles or Nott or Omni or Aureus. Other than the transaction involving the lease of the sewing machines, there is no evidence that the businesses of the corporations were interrelated at all. Coala was in the business of manufacturing clothing. Neither Aureus nor Omni was involved in that business. Neither can, therefore, be said to have dominated or directed the business of Coala in any fashion. The stipulation submitted by the parties does not even indicate whether or not, and to what extent, Hyles and Nott were actually involved in the management of any of the corporations.[23]

B. Unqualified Foreign Corporations Theory
The former employees also contend that Aureus and Omni are precluded from obtaining possession of their equipment because neither has complied with Ala.Code § 10-2A-226 (1975).[24] Under Ala.Code § 10-2A-226, a foreign corporation may not transact business in the state of Alabama until it obtains a certificate of authority from the Secretary of State. The only consequence of failure of a foreign corporation to comply with Ala.Code § 10-2A-226 is spelled out in Ala.Code § 10-2A-247, which provides as follows:
All contracts or agreements made or entered into in this state by foreign corporations which have not obtained a certificate of authority to transact business in this state shall be void at the action of such foreign corporation or any person claiming through or under such foreign corporation by virtue of said void contract or agreement. . . . [25]
*898 The argument of the former employees must fail for two reasons. First of all, application of the statute requires that the business being conducted by the foreign corporation be "intrastate" rather than "interstate" in character. The singular act of a foreign corporation, consisting of a lease of business equipment to an Alabama corporation, constitutes interstate business rather than intrastate business. Therefore, the foreign corporation is not required to obtain a certificate of authority before leasing the equipment, or suing for breach of the lease. An almost identical situation was addressed by the Supreme Court of Alabama. In that case the Court's opinion stated:
In these contracts the machines are leased by the foreign corporation to the domestic corporation to be used by the lessee for three years in its factory in this state. The machines are shipped by the lessor from Virginia to the lessee in Alabama, the lessee is to pay the freight, and the annual rental is to be paid when the machines are delivered. After the termination of the leases the machines are to be returned to the lessor in Virginia by the lessee, freight prepaid, by the lessee. The lessee is to keep the machines during the lease fully insured in favor of the lessor against loss by fire. The leasing of these machines under the contract and the facts constitute interstate commerce. Similar contracts of leasing chattels by the residents of one state to a resident of another state have been held to constitute interstate commerce, and the lessor was not thereby engaging in business or transacting business in the state of the lessee, which made the lessor subject to the conditions imposed by the statutes of the state of the lessee.
Houston Canning Co. v. Virginia Can Co., 211 Ala. 232, 234, 100 So. 104 (1924). More recently, the Alabama Supreme Court revisited the issue in Johnson v. MPL Leasing Corp., 441 So.2d 904 (Ala.1983), in which the following circumstances were presented:
MPL Leasing Corporation ("MPL") is a California corporation organized for the purpose of offering alternative financing plans to dealers of Saxon Business Products. Saxon specializes in the sale of paper copiers which are distributed through independent dealers located throughout the United States, including Alabama. Jay Johnson was a Saxon dealer in Alabama.
Through mailings and telephone calls into the state, MPL solicited Johnson's attendance at a sales seminar in Atlanta. Johnson attended the seminar and entered into an agreement with MPL. The agreement provided for Johnson to lease Saxon copiers with the option to buy. MPL shipped the machines into Alabama and filed a financing statement with the Secretary of State.
Johnson became several months delinquent with his payments to MPL. MPL filed suit in Montgomery Circuit Court. Johnson moved to dismiss, alleging, among other defenses, that MPL was not qualified to do business in Alabama. We find that the trial judge correctly denied the motion.
441 So.2d at 905. The court held that MPL's activities constituted interstate commerce and that, consequently, MPL could enforce the lease contract in the Alabama state courts. In that regard, the court stated:
MPL's activities within Alabama are limited to (1) delivering copying machines by common carrier and (2) filing this action. This Court has never held previously that contacts as minimal as those of MPL constitute "intrastate business."
Id. at 905.[26]
In addition, the statute does not purport to affect the property rights of unqualified corporations or to prohibit unqualified *899 corporations from utilizing Alabama courts to reclaim property owned by them. While the effect of the statute is to prohibit contract actions by unqualified corporations, it does not bar suits to exercise proprietary interests in property. Leasing Service Corp. v. Hobbs Equipment Co., 707 F.Supp. 1276, 1287 (N.D.Ala.1989) aff'd in part on other grounds and rev'd in part on other grounds, 894 F.2d 1287 (11th Cir.1990); In re Delta Molded Products, Inc., 416 F.Supp. 938, 945 (N.D.Ala.1976), aff'd Sterne v. Improved Machinery, Inc., 571 F.2d 957 (5th Cir.1978); Jones v. Americar, Inc., 283 Ala. 638, 643, 219 So.2d 893 (Ala.1969); Capitol Lumber Co. v. Mullinix, 208 Ala. 266, 268, 94 So. 88 (1922); Boulden v. Estey Organ Co., 92 Ala. 182, 9 So. 283 (1890). The statute would not, therefore, prohibit the present effort by Aureus and Omni to obtain possession of the sewing equipment leased to Coala, even if the transactions had been intrastate in nature.[27]

IV. CONCLUSION
Based upon the foregoing discussion, the Court finds that the property made the basis of this adversary proceeding belongs to Aureus and Omni, that the complaint filed by Aureus and Omni to obtain the return of the property from the trustee in bankruptcy should be granted, and that the objections filed by the former employees to the complaint should be denied. A separate order will be entered in accordance with this memorandum opinion.

APPENDIX

JOINT STIPULATION OF FACTS

January 11, 1995
COMES NOW the parties and jointly stipulate to the following facts:
In November of 1992, Frieda F. Hyles, the President of Aureus International, Inc., a Colorado Corporation, was notified by Thomas Bumbarger, that a number of sewing machines were for sale by Walker and Reed Manufacturing Company in Moulton, Lawrence County, Alabama. The asking price for the sewing machines and some other equipment was $25,000.00.
On December 18, 1992, Teddy Reed and Novel Walker executed and delivered two (2) Bills of Sales conveying the equipment used in the sewing operation of Walker and Reed Manufacturing to "Frieda F. Hyles, Aureus International DBA", a copy of which is attached hereto and marked for identification purposes as EXHIBIT 1, and to Omni Executive Recruiters, Inc., a copy of which is attached hereto and marked for identification purposes as EXHIBIT 2. E.C. Nott, who is one and the same person as Edward C. Nott, is the President of Omni Executive Recruiters, Inc., a Colorado Corporation.
Aureus International, Inc. purchases sixty percent (60%) of the furniture, fixtures, equipment and supplies belonging to Walker and Reed Manufacturing Company. Aureus International, Inc. paid $10,000.00 in cash by a bank wire transfer and Aureus International, Inc. gave Teddy Reed and Novel Walker a promissory note in the amount of $5,000.00 to be paid beginning on February 1, 1993, and to be paid at the rate of $1,000.00 a month for five (5) consecutive months.
Omni Executive Recruiters, Inc. purchased forty percent (40%) of the furniture, fixtures, equipment and supplies belonging to Walker *900 and Reed Manufacturing Company. Omni Executive Recruiters, Inc. paid $10,000.00 in cash by a bank wire transfer.
A true and correct list of the furniture, fixtures, equipment and supplies sold by Walker and Reed Manufacturing Company to Aureus International, Inc. and Omni Executive Recruiters, Inc. is attached hereto and marked for identification purposes as EXHIBIT 3.
On January 2, 1993, Aureus International, Inc. purported to lease the equipment in question to Coala, Inc., with Frieda Hyles signing the lease document for Aureus International as its President and Frieda Hyles signed the lease document for Coala as President with Edward C. Nott signing the lease document for Coala as its secretary/treasurer. The lease provided for payment from Coala to Aureus International, Inc. of $480.00 per month for 60 months, a $1.00 security deposit, late charges for delinquent payments and a requirement for Coala to insure the equipment. A true and correct copy of said lease is attached hereto and marked for identification purposes as EXHIBIT 4.
On January 2, 1993, Omni, Inc. purported to lease the equipment in question to Coala, Inc., with Edward C. Nott signing the lease document for Omni, Inc. as its President and Frieda Hyles signed the lease document for Coala as its President with Edward C. Nott signing the lease document for Coala as its secretary/treasurer. The lease provided for payment from Coala to Omni, Inc. of $320.00 per month for 60 months, a $1.00 security deposit, late charges for delinquent payments and a requirement for Coala to insure the equipment. A true and correct copy of said lease is attached hereto and marked for identification purposes as EXHIBIT 5.
A reservation of corporate name was obtained for Coala, Inc. on December 15, 1992. The Articles of Incorporation of Coala, Inc. were filed on January 12, 1993, in Lawrence County, Alabama. The initial directors of Coala, Inc. were Frieda Hyles and Edward C. Nott. Frieda Hyles was President of Coala, Inc. Edward C. Nott was secretary/treasurer of Coala, Inc. Frieda Hyles and Edward C. Nott were the sole shareholders of Coala, Inc.
No payments were made from Coala, Inc. to either Aureus International, Inc. or to Omni Executive Recruiters, Inc. under the leases.
There were no threats to repossess the equipment due to default made.
There was no evident of insurance given by Coala, Inc. to Omni Executive Recruiters, Inc. or Aureus International, Inc. pursuant to the lease provisions.
There were no UCC-1 financing statements filed listing Omni Executive Recruiters, Inc. or Aureus International, Inc. as lienholders on the subject equipment.
There was no security deposit paid by Coala, Inc. to Omni Executive Recruiters, Inc. or Aureus International, Inc.
Omni Executive Recruiters, Inc. did not apply for or receive permission to conduct business in the State of Alabama.
Aureus International, Inc. did not apply for or receive permission to conduct business in the State of Alabama.
Omni Executive Recruiters, Inc. did not list the subject equipment with the Lawrence County, Alabama, Tax Assessor, Tommy Praytor, for personal property tax purposes in 1993.
Aureus International, Inc. did not list the subject equipment with the Lawrence County, Alabama, Tax Assessor, Tommy Praytor, for personal property tax purposes in 1993.
Coala, Inc did not have any assets when the equipment was bought.
The primary creditors of Coala, Inc. are former employees who are owed money for wages earned within ninety (90) days of the filing of the involuntary bankruptcy petition.
NOTES
[1] Deposition transcripts were filed with the Court but were not offered as evidence.
[2] The Court adopts, without the accompanying exhibits, the parties' Joint Stipulation of Facts as filed on January 11, 1995. That stipulation, without its original exhibits, is attached hereto.
[3] The following statement of Alabama law applies:

A corporation, however, is an independent legal entity, separate and distinct from its shareholders. The legal title and ownership of corporate property is in the corporation. Warrior River Terminal Co. v. State, 257 Ala. 208, 58 So.2d 100 (1952); Martin Truck Line, Inc. v. Alabama Tank Lines, Inc., 261 Ala. 163, 73 So.2d 756 (1954). A share of stock in a corporation merely entitles a shareholder to an aliquot portion of the proceeds of the assets of the corporation, over and above the indebtedness of the corporation. Hall & Farley v. Alabama Terminal & Improvement Co., 173 Ala. 398, 56 So. 235 (1911). A shareholder is not, however, entitled to share in the assets of the corporation until a dividend is declared or except upon liquidation of the corporation. First National Bank of Birmingham v. Perfection Bedding Co., 631 F.2d 31 (5th Cir.1980); Jones Valley Finance Co. v. Tennille, 40 Ala. App. 284, 115 So.2d 495 (1959), cert. denied, 270 Ala. 738, 115 So.2d 504 (1959). Until either of said events occur, the shareholders are but the equitable owners of corporate property. First National Bank of Birmingham v. Perfection Bedding Co., 631 F.2d at 33; Martin Truck Line, Inc. v. Alabama Tank Lines, Inc., 73 So.2d at 759.
In re Sandefer, 47 B.R. 133, 135 (Bankr.N.D.Ala. 1985). "The corporation is a person and its ownership is a nonconductor that makes it impossible to attribute an interest in its property to its members." Warrior River Terminal Co. v. State, 257 Ala. 208, 212, 58 So.2d 100, 102 (1952), quoting Justice Holmes in Klein v. Board of Tax Supervisors, 282 U.S. 19, 23, 51 S.Ct. 15, 15, 75 L.Ed. 140 (1930).
Of course, if property has been fraudulently conveyed by the individual stockholders to the corporation, the separate corporate existence should be disregarded to allow creditors of the individual to reach the property. John R. Steele & Assoc., Inc. v. Villante, 659 F.Supp. 157 (D.N.J.1987); Eisenberg v. Casale, 72 B.R. 222 (E.D.N.Y.1987). For example, in divorce situations, if a husband purchased assets with personal funds but placed title to the assets in the name of a shell corporation so as to shield the property from the marital claims of the wife, the divorce court will customarily treat the assets as belonging to the husband and not the corporation for purposes of making the marital property division. Vallone v. Vallone, 644 S.W.2d 455 (Tex. 1982); Lyons v. Lyons, 340 So.2d 450 (Ala.Civ. App.1976); Dandini v. Dandini, 120 Cal.App.2d 211, 260 P.2d 1033 (Cal.Ct.App.1953). Also, in matters involving the probate of a decedent's estate and distribution of estate property, a court may treat property purchased by the decedent with personal funds as part of the probate estate, although title to the property was placed in a corporation wholly owned by the decedent. In re Will of Stukalo, 7 Misc.2d 1042, 166 N.Y.S.2d 478 (N.Y.Surr.1957). See also Central Motors & Supply Co. v. Brown, 219 Minn. 467, 18 N.W.2d 236 (1945) (court properly disregarded corporate veil where corporation sued sheriff for value of automobiles owned by corporation sold by sheriff to satisfy judgment against individual stockholder who was alter ego of corporation and used corporation as mere agency to hide his own property from creditors).
While dicta found in Simmons v. Clark Equipment Credit Corp., 554 So.2d 398 (Ala.1989) may suggest wider application of the theory advanced by the former employees, the Court has found no additional support for the theory in case law. Since the former employees have offered no proof that there had been a fraudulent conveyance of the sewing equipment from Hyles and Nott to Aureus and Omni, or that the sewing equipment was actually purchased in the first place by Hyles and Nott with their own personal funds, the "inverted alter ego" theory must fail in this case.
[4] Southern Sash Sales and Supply Co. v. Wiley, 631 So.2d 968, 969 (Ala.1994); Backus v. Watson, 619 So.2d 1342, 1345 (Ala. 1993); M & M Wholesale Florist, Inc. v. Emmons, 600 So.2d 998, 999 (Ala.1992); First Health, Inc. v. Blanton, 585 So.2d 1331, 1334 (Ala.1991); Huntsville Aviation Corp. v. Ford, 577 So.2d 1281, 1287 (Ala. 1991); Wright v. Alan Mills, Inc., 567 So.2d 1318, 1319 (Ala.1990); Simmons v. Clark Equipment Credit Corp., 554 So.2d 398, 400 (Ala.1989); Co-Ex Plastics, Inc. v. AlaPak, Inc., 536 So.2d 37, 38 (Ala.1988); Messick v. Moring, 514 So.2d 892, 894 (Ala.1987); East End Memorial Assoc. v. Egerman, 514 So.2d 38, 42 (Ala.1987); Deupree v. Ruffino, 505 So.2d 1218, 1222 (Ala.1987); Washburn v. Rabun, 487 So.2d 1361, 1366 (Ala. 1986); Barrett v. Odom, May and DeBuys, 453 So.2d 729, 732 (Ala.1984); McKissick v. Auto-Owners Insurance Co., 429 So.2d 1030, 1032 (Ala. 1983); Alorna Coat Corp. v. Behr, 408 So.2d 496, 498 (Ala.1981); Cohen v. Williams, 294 Ala. 417, 420, 318 So.2d 279, 281 (1975); Scudder v. Scudder, 485 So.2d 743, 745 (Ala.Civ.App.1986). As stated by the Supreme Court of Alabama:

The doctrine is well established, and obtains both in law and equity, that a corporation is a distinct entity, to be considered separate and apart from the individuals who compose it, and is not to be affected by the personal rights, obligations and transactions of its stockholders; and this, whether said rights accrued, or obligations were incurred, before or subsequent to incorporation.
East End Memorial Assoc. v. Egerman, 514 So.2d 38, 42 (Ala.1987).
[5] Huntsville Aviation Corp. v. Ford, 577 So.2d 1281, 1287 (Ala.1991).
[6] In re Birmingham Asbestos Litigation, 619 So.2d 1360, 1362 (1993).
[7] Backus v. Watson, 619 So.2d 1342, 1345 (Ala. 1993); In re Birmingham Asbestos Litigation, 619 So.2d 1360, 1362 (Ala.1993); M & M Wholesale Florist, Inc. v. Emmons, 600 So.2d 998, 999 (Ala.1992); First Health, Inc. v. Blanton, 585 So.2d 1331, 1334 (Ala.1991); Simmons v. Clark Equipment Credit Corp., 554 So.2d 398, 400 (Ala. 1989).
[8] Lyons v. Lyons, 340 So.2d 450, 451 (Ala.Civ. App.1976).
[9] Southern Sash Sales and Supply Co. v. Wiley, 631 So.2d 968, 969 (Ala.1994); M & M Wholesale Florist, Inc. v. Emmons, 600 So.2d 998, 999 (Ala. 1992); Huntsville Aviation Corp. v. Ford, 577 So.2d 1281, 1287 (Ala.1991); Thorne v. C & S Sales Group, 577 So.2d 1264, 1266 (Ala.1991); Wright v. Alan Mills, Inc., 567 So.2d 1318, 1319 (Ala.1990); Co-Ex Plastics, Inc. v. AlaPak, Inc., 536 So.2d 37, 38 (Ala.1988); East End Memorial Assoc. v. Egerman, 514 So.2d 38, 42 (Ala.1987); Deupree v. Ruffino, 505 So.2d 1218, 1222 (Ala. 1987); Washburn v. Rabun, 487 So.2d 1361, 1366 (Ala.1986); Barrett v. Odom, May and DeBuys, 453 So.2d 729, 732 (Ala.1984); Woods v. Commercial Contractors, Inc., 384 So.2d 1076, 1079 (Ala.1980).
[10] Matrix-Churchill v. Springsteen, 461 So.2d 782, 788 (Ala.1984); Kwick Set Components, Inc. v. Davidson Industries, Inc., 411 So.2d 134, 137 (Ala.1982).
[11] Johnston v. Green Mountain, Inc., 623 So.2d 1116, 1120 (Ala.1993); In re Birmingham Asbestos Litigation, 619 So.2d 1360, 1362 (Ala.1993); Backus v. Watson, 619 So.2d 1342, 1345 (Ala. 1993); First Health, Inc. v. Blanton, 585 So.2d 1331, 1334-1335 (Ala.1991); Simmons v. Clark Equipment Credit Corp., 554 So.2d 398, 400 (Ala. 1989).
[12] McKissick v. Auto-Owners Insurance Co., 429 So.2d 1030, 1033 (Ala.1983).
[13] Backus v. Watson, 619 So.2d 1342, 1345 (Ala. 1993); Simmons v. Clark Equipment Credit Corp., 554 So.2d 398, 400 (Ala.1989).
[14] Washburn v. Rabun, 487 So.2d 1361, 1366 (Ala.1986).
[15] Wright v. Alan Mills, Inc., 567 So.2d 1318, 1319 (Ala.1990); Co-Ex Plastics, Inc. v. AlaPack, Inc., 536 So.2d 37, 39 (Ala.1988); Washburn v. Rabun, 487 So.2d 1361, 1319 (Ala.1986).
[16] Johnston v. Green Mountain, Inc., 623 So.2d 1116, 1120 (Ala.1993); Kwick Set Components, Inc. v. Davidson Industries, Inc., 411 So.2d 134, 136 (Ala.1982).
[17] Southern Sash Sales and Supply Co. v. Wiley, 631 So.2d 968, 969 (Ala.1994); Backus v. Watson, 619 So.2d 1342, 1345 (Ala.1993); Huntsville Aviation Corp. v. Ford, 577 So.2d 1281, 1287 (Ala.1991); Simmons v. Clark Equipment Credit Corp., 554 So.2d 398, 400 (Ala.1989); Co-Ex Plastics, Inc. v. AlaPak, Inc., 536 So.2d 37, 38 (Ala.1988); Messick v. Moring, 514 So.2d 892, 894 (Ala.1987); East End Memorial Assoc. v. Egerman, 514 So.2d 38, 42 (Ala.1987); Deupree v. Ruffino, 505 So.2d 1218, 1222 (Ala.1987); Washburn v. Rabun, 487 So.2d 1361, 1366 (Ala. 1986); Barrett v. Odom, May and DeBuys, 453 So.2d 729, 732 (Ala.1984); McKissick v. Auto-Owners Insurance Co., 429 So.2d 1030, 1032 (Ala.1983); Kwick Set Components, Inc. v. Davidson Industries, Inc., 411 So.2d 134, 136 (Ala. 1982); Woods v. Commercial Contractors, Inc., 384 So.2d 1076, 1079 (Ala.1980); Cohen v. Williams, 294 Ala. 417, 421, 318 So.2d 279, 281 (1975); Forest Hill Corp. v. Latter & Blum, 249 Ala. 23, 28, 29 So.2d 298, 302 (1947).
[18] Messick v. Moring, 514 So.2d 892, 894 (Ala. 1987); East End Memorial Assoc. v. Egerman, 514 So.2d 38, 42 (Ala.1987); Deupree v. Ruffino, 505 So.2d 1218, 1222 (Ala.1987); Washburn v. Rabun, 487 So.2d 1361, 1366 (Ala.1986); Barrett v. Odom, May and DeBuys, 453 So.2d 729, 732 (Ala.1984); McKissick v. Auto-Owners Insurance Co., 429 So.2d 1030, 1033 (Ala.1983); Alorna Coat Corp. v. Behr, 408 So.2d 496, 498 (Ala. 1981); Cohen v. Williams, 294 Ala. 417, 420, 318 So.2d 279, 280-281 (1975); C.E. Development Co. v. Kitchens, 288 Ala. 660, 666, 264 So.2d 510, 515 (1972); Morgan Plan Co. v. Vellianitis, 270 Ala. 102, 107, 116 So.2d 600, 604 (1959); Cleghorn v. Ferron Metalcraft, 587 So.2d 400, 401 (Ala.Civ.App.1991); Paddock, Smith & Aydlotte v. WAAY Television, 410 So.2d 106, 108 (Ala.Civ. App.1982); Lyons v. Lyons, 340 So.2d 450, 451 (Ala.Civ.App.1976); Scudder v. Scudder, 485 So.2d 743, 745 (Ala.Civ.App.1986).
[19] M & M Wholesale Florist, Inc. v. Emmons, 600 So.2d 998 (Ala.1992); First Health, Inc. v. Blanton, 585 So.2d 1331 (Ala.1991); Messick v. Moring, 514 So.2d 892 (Ala.1987).
[20] The fact that a corporation is under-capitalized is not alone sufficient to impose personal liability on the corporation's stockholders. Backus v. Watson, 619 So.2d 1342, 1345 (Ala.1993); Simmons v. Clark Equipment Credit Corp., 554 So.2d 398, 400 (Ala.1989).
[21] The fact that an individual owns all or a majority of the stock of a corporation does not, of itself, destroy the separate corporate entity. Backus v. Watson, 619 So.2d 1342, 1345 (Ala.1993); First Health, Inc. v. Blanton, 585 So.2d 1331, 1334 (Ala.1991); Simmons v. Clark Equipment Credit Corp., 554 So.2d 398, 400 (Ala.1989); Messick v. Moring, 514 So.2d 892, 895 (Ala.1987). Even if Hyles and Nott owned all of the stock of all three corporations, "the mere fact that some or all of the stockholders or officials of two corporations are identical or because one corporation dominates the other does not, of itself, destroy the corporate identity or merge one into the other." Forest Hill Corp. v. Latter & Blum, 249 Ala. 23, 26, 29 So.2d 298, 300 (1947).
[22] The mere fact that minor corporate formalities were not followed does not rise to such a level that the corporate veil should be pierced. Co-Ex Plastics, Inc. v. AlaPak, Inc., 536 So.2d 37, 39 (Ala.1988).
[23] While some of the remaining stipulations relied upon by the former employees indicate that a measure of control was exercised by Hyles and Nott over all three corporations, they constitute no evidence of misuse of corporate control or that the misuse of control resulted in any damage to Coala or its employees. To the contrary, by allowing Coala to conserve precious operating capital, Coala and the former employees were the immediate beneficiaries of the actions taken by Aureus and Omni to alleviate expenditures that Coala would have otherwise had to make, for example, in the form of security deposits and insurance premiums, had the equipment been leased from someone other than Aureus and Omni. In addition, the following points may be made regarding each stipulation:

(1) Coala did not provide evidence of insurance to Aureus and Omni as is required under the lease agreements.
The fact that Coala did not provide evidence of insurance to Aureus and Omni does not obviate the possibility that the property was actually insured either by Coala, Omni, or Aureus. Also, whether or not the property was insured should have been primarily the concern of Aureus and Omni, and not Coala and the former employees. If Aureus and Omni did not insist on the property being insured, it was their investment at risk and not that of Coala.
(2) Neither Aureus nor Omni filed a UCC-1 statement covering the property.
Article 9 of the Uniform Commercial Code applies to security interests; not to leases.
(3) Coala did not pay security deposits to Aureus and Omni.
Once again, Coala and the former employees were the immediate beneficiaries of the fact that only de minimis security deposits of $1.00 were required under the lease contract.
(4) Neither Aureus nor Omni listed the property with the Lawrence County tax assessor.
The relevance of this stipulation to the former employees' arguments is not apparent.
[24] The statute has been repealed and replaced by Ala.Code § 10-2B-15.01(a), which, for purposes relative to the issues addressed in this opinion, is identical to the previous statute.
[25] The statute has been repealed and replaced by Ala.Code § 10-2B-15.02(a), which provides as follows:

A foreign corporation transacting business in this state without a certificate of authority or without complying with Sections 40-14-1 through 40-14-3, 40-14-21, or 40-14-41 may not maintain a proceeding in any court in this state until it obtains a certificate of authority, complies with Sections 40-14-1 through 40- 14-3, Section 40-14-21 and Section 40-14-41, and discharges its liability under subsection (d) hereof.
[26] See, e.g. North Alabama Marine, Inc. v. Sea Ray Boats, Inc., 533 So.2d 598 (Ala.1988) (foreign corporation could enforce in Alabama courts purchase money security interest in inventory even though not qualified to do business in Alabama); Billions v. White and Stafford Furniture Co., 528 So.2d 878 (Ala.Civ.App.1988) (foreign corporation could enforce in Alabama courts retail installment contract even though not qualified to do business in Alabama); Loudonville Milling Co. v. Davis, 251 Ala. 459, 37 So.2d 659 (1948) (contract to sell flour by foreign corporation not qualified to business in Alabama which was shipped in carload lots to foreign corporation at its Alabama warehouse and sold to Alabama distributors for resale was "interstate" commerce); Watkins v. Goggans, 242 Ala. 222, 5 So.2d 472 (1941) (foreign corporation whose business consisted of sales by way of orders sent to its place of business outside of the state, where they were accepted or rejected, and if accepted the orders were filled and the goods shipped into Alabama could maintain contract suit in Alabama courts even though not qualified to do business in Alabama).
[27] The case cited and relied upon by the former employees, Allstate Leasing Corp. v. Scroggins, 541 So.2d 17 (Ala.Civ.App.1989), does not compel a different conclusion on either issue. The court in Allstate found that the equipment lessor in that case was engaged in intrastate business because it "had owned within this state on a routine and ongoing basis many machines which it had leased to Alabama residents, and the continuing ownership of those machines in Alabama is an indispensable part of Allstate's primary business activity." 541 So.2d at 18. Furthermore, the action brought by the lessor in Allstate was for breach of the lease, and not to recover possession of the property.